*United States v. Bershchansky*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2014

(Argued: September 29, 2014     Decided: June 5, 2015)

Docket No. 13-3145

UNITED STATES OF AMERICA,

*Appellant*,

*v.*

YURI BERSHCHANSKY,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

Before:

WINTER and CHIN, *Circuit Judges*,
and OETKEN, *District Judge*.[*]

---

[*]     The Honorable J. Paul Oetken, of the Southern District of New York, sitting by designation.

Interlocutory appeal by the government from an order of the United States District Court for the Eastern District of New York (Matsumoto, *J.*), granting defendant's motion to suppress physical evidence and statements obtained during the execution of a search warrant. The district court held that federal agents exceeded the scope of the search warrant and that the good-faith exception to the exclusionary rule was inapplicable.

AFFIRMED.

---

SARITHA KOMATIREDDY, Assistant United States Attorney (David C. James, Assistant United States Attorney, *on the brief*), *for* Loretta E. Lynch, United States Attorney, Eastern District of New York, Brooklyn, New York, *for Appellant*.

MEGAN WOLFE BENETT, New York, New York, *and* Gary Farrell, New York, New York, *for Defendant-Appellee.*

---

CHIN, *Circuit Judge*:

In this case, the Department of Homeland Security ("DHS") identified a computer in Brooklyn, New York, that it believed was offering, on a peer-to-peer network, electronic files that contained child pornography. DHS agents determined that the computer was subscribed to defendant-appellee Yuri Bershchansky and they obtained a warrant to search what they apparently

-2-

believed to be his residence. The agents searched Bershchansky's home, seized his computer equipment, and elicited a confession from him. Bershchansky was later arrested and charged with one count of possessing child pornography in violation of 18 U.S.C. §§ 2252(a)(4)(B) and 2252(b)(2).

The warrant authorized a search of Apartment 2 at the location where Bershchansky lived, but the agents executed the warrant by searching Apartment 1 instead. Bershchansky moved to suppress on the grounds that the agents exceeded the scope of the warrant when they searched an apartment other than the one approved by the magistrate judge. On July 19, 2013, the United States District Court for the Eastern District of New York (Matsumoto, *J.*) granted the motion. The government appeals. We affirm.

*BACKGROUND*

A.   *The Investigation*

After two evidentiary hearings, the district court made detailed findings of fact. Based on the district court's findings and the record in the case, we summarize the facts as follows:

In November 2010, an investigator in the Homeland Security Investigations unit ("HSI") of DHS identified a computer on a peer-to-peer network that he believed was hosting digital files known to be associated with

child pornography.[1]  The computer was logged in from Internet Protocol address 24.185.53.197 (the "IP Address").[2]  The investigator "direct connected" to the IP Address and discovered numerous video and image files being offered for download, many of which contained titles indicative of child pornography.  The investigator, using special software, downloaded these files.

Special Agent Robert Raab, a member of HSI's Child Exploitation Group, was assigned to investigate the IP Address.  He confirmed that the downloaded files contained images of child pornography.  He also determined that the IP Address was registered to Cablevision, an internet service provider. He issued an administrative summons to Cablevision, requesting the subscriber information associated with the IP Address.  Cablevision informed Raab that, during the relevant time period, the IP Address was assigned to "Yuri Bershchansky" at address "2462 Gerritsen Av Apt 2" in Brooklyn, New York. Raab next contacted Con Edison, an electrical service provider, by telephone to confirm the subscriber information associated with the Gerritsen Avenue address

---

[1]        A peer-to-peer network allows computer users to share electronic files directly with each other, not through a central server or website.  *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 919-20 (2005).

[2]        An internet protocol ("IP") address is a numerical label consisting of four numbers, separated by periods.  Every computer that communicates with an internet network is assigned a unique IP address.  *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 409-11 (2d Cir. 2004).

provided by Cablevision. Raab testified that a Con Edison representative told him that the bill for Apartment 2 at 2462 Gerritsen Avenue in Brooklyn was in Bershchansky's name.

Next, Raab, along with Special Agent Steven Cerutti, visited 2462 Gerritsen Avenue to confirm Bershchansky's residence. The building at 2462 Gerritsen Avenue is a multi-family dwelling with at least three apartments. Two exterior doors face Gerritsen Avenue, with one on the left, slightly above street level, and the other on the right, slightly below street level. The apartment on the left is Apartment 2 and the apartment on the right is Apartment 1.[3] Raab and Cerutti knocked on the door to the left (Apartment 2) and a young woman, Anna Klishina, answered. The agents proceeded to ask her who lived in the apartment. Anna answered that she lived there with her mother and stepfather. The agents next asked whether an individual named "Kim" -- a fictitious name -- lived in the apartment to the right. Raab and Cerutti testified that they could not remember the "exact words" of Anna's response, but Anna's mother, Svetlana Klishina, overheard the conversation and testified that Anna told the agents that "Kim" did not live in that apartment, but rather, that a mother and her son lived there. When the agents initially went to the apartment on the left, they did not

---

[3]    The entrance to a third apartment was around the corner, on a different street.

know who lived there, and they picked it "just [as] a place to start." G. App. at 160. After speaking to Anna, they did not rule out that Bershchansky lived in the apartment with the Klishina family.

## B. *The Search Warrant Application*

On January 24, 2011, Raab submitted a search warrant application for "2462 GERRITSEN AVENUE, APT. #2, BROOKLYN, NY 11229." In his affidavit, Raab described the premises to be searched as follows:

> The SUBJECT PREMISES is an apartment located within a two-story red brick multi-family dwelling, which is attached on one side. The front of the dwelling has two exterior doors. The door to the left leads upstairs to apartment #1. The door to the right as you face the building leads to the SUBJECT PREMISES. The door is brown and bears the number "2462 2".

G. App. at 171. Raab did not mention whether the door to the right was upstairs or downstairs. In his affidavit, he also summarized the steps HSI took in investigating the computer associated with the IP Address. He repeatedly cited the IP Address as the target of the investigation. He further outlined how he determined that the IP Address was subscribed to "Yuri Bershchansky of 2462 Gerritsen Avenue Apartment 2, Brooklyn, New York." Specifically, Raab represented that Cablevision, Con Edison, and Anna Klishina confirmed that Bershchansky lived in Apartment 2. Raab concluded that there was "probable

cause to believe that there is kept and concealed within THE PREMISES KNOWN AND DESCRIBED AS 2462 GERRITSEN AVENUE, APT. #2, BROOKLYN, NY 11229 . . . evidence or instrumentalities of . . . sexually explicit material relating to children." G. App. at 168.

In fact, records from Con Edison -- obtained after the search warrant was issued -- indicated that Bershchansky's service address was "2462 Gerritsen Ave 1FL." The Con Edison records also indicated that "2462 GERRITSEN AVE 2FL" was assigned to "Svedlana Klishina."[4] The Cablevision records obtained before the search indicated -- erroneously -- that Bershchansky resided in Apartment 2.

The magistrate judge (Azrack, *J.*) reviewed the warrant application and Raab's supporting affidavit and issued the requested warrant authorizing the search of 2462 Gerritsen Avenue, Apartment 2. Thereafter, Raab prepared and distributed an Enforcement Operation Plan to apprise the search team of the place to be searched, the target of the investigation, and any potential safety hazards. The Enforcement Operation Plan repeatedly identified "2462 Gerritsen Avenue #2, Brooklyn, NY" as the place to be searched and included no other

---

[4]     Raab later testified that he could not recall the "exact wording" of his conversation with a Con Edison representative, but he admitted that the representative did not, in fact, tell him which apartment Bershchansky lived in. G. App. at 126-27.

physical descriptions of the residence. Raab also held a pre-search briefing with the search team and circulated a copy of the search warrant.

## C.    *The Execution of the Search Warrant*

On January 28, 2011, approximately eight HSI agents -- including Raab and Cerutti -- assembled to execute the search warrant. Upon arriving at 2462 Gerritsen Avenue, Raab knocked on the door to the right, Apartment 1. Bershchansky's mother answered and the agents informed her of the search warrant. Raab and the other agents then entered the apartment to conduct the search, finding and seizing computer equipment, including a desktop computer and two external hard drives. Photographs of the doors received into evidence at the suppression hearing show that both the outer and inner doors to the apartment to the left were clearly marked "2," and that the inner door to the apartment on the right -- the apartment that was searched -- was clearly marked "1."[5]

---

[5]      The record is unclear as to when the photographs were taken. They apparently were taken by the defense, but they were received into evidence at the behest of the government. While the record is silent as to whether the photographs accurately depict the doors as they appeared in January 2011 (the hearing took place in December 2012), the inner wooden doors in the photographs appear worn and old and both doors prominently display apartment numbers. The two outer screen doors appear to be newer. The outer screen door to Apartment 2 is clearly marked "2," while the outer screen door to Apartment 1 does not appear to bear the apartment number.

Bershchansky was present during the search and the agents proceeded to interview him. He admitted receiving and possessing child pornography. The government would later, through forensic review, determine the presence of more than 100 electronic files containing child pornography in the seized computer equipment. On December 21, 2011, Bershchansky was arrested and charged with possession of child pornography, in violation of 18 U.SC. §§ 2252(a)(4)(B) and 2252(b)(2).

**D.     *Proceedings Below***

On March 30, 2012, Bershchansky moved to suppress the computer evidence and admissions in question. Bershchansky argued, *inter alia*, that the search warrant was not supported by probable cause and that Raab knowingly misled the magistrate judge by omitting material information in the warrant application. On May 15, 2012, the district court held a hearing on the motion and reserved judgment. On August 10, 2012, Bershchansky filed a supplemental brief arguing that this Court's intervening decision in *United States v. Voustianiouk*, 685 F.3d 206 (2d Cir. 2012), required suppression of the evidence. On December 12, 2012, the district court held a second evidentiary hearing.

On July 19, 2013, the district court issued a well-reasoned and carefully-considered thirty-page memorandum and order, ordering the

suppression of the evidence seized and statements made during the execution of the warrant. *United States v. Bershchansky*, 958 F. Supp. 2d 354 (E.D.N.Y. 2013). The district court concluded that the agents exceeded the scope of the search warrant by searching premises other than the one they were authorized to search, and it also determined that the good faith exception to the exclusionary rule did not apply. Hence, it suppressed the evidence. *Id.* at 383. This appeal followed.[6]

### *DISCUSSION*

We consider three areas of dispute: (a) the standard of review; (b) the scope of the search warrant; and (c) the good faith exception to the exclusionary rule.

**A.  *Standard of Review***

On appeal from a district court's ruling on a motion to suppress evidence, "we review legal conclusions de novo and findings of fact for clear error." *United States v. Freeman*, 735 F.3d 92, 95 (2d Cir. 2013). We also review *de novo* mixed questions of law and fact. *Id.* (citing *United States v. Lucky*, 569 F.3d 101, 105-06 (2d Cir. 2009)). We "pay special deference to the district court's

---

[6]      We have jurisdiction over this interlocutory appeal pursuant to 18 U.S.C. § 3731.

factual determinations going to witness credibility." *United States v. Jiau*, 734 F.3d

147, 151 (2d Cir. 2013).

Bershchansky contends further that, as the prevailing party below,

he is entitled to have the evidence viewed in the light most favorable to him.

Indeed, in a number of our decisions we have held that, when reviewing a

district court's decision on a motion to suppress, we view the evidence in the

light most favorable to the prevailing party, e.g., the defendant where the motion

is granted. *See, e.g.*, *United States v. Andino*, 768 F.3d 94, 98 (2d Cir. 2014); *United*

*States v. Murphy*, 703 F.3d 182, 189 (2d Cir. 2012); *United States v. Jackson*, 652 F.2d

244, 246 (2d Cir. 1981); *United States v. Oates*, 560 F.2d 45, 49 (2d Cir. 1977). The

government, however, argues that where a defendant's motion to suppress is

granted, the evidence should be viewed in its favor even though it did not

prevail below, and, to be sure, there is authority to support that proposition. *See,*

*e.g.*, *United States v. Barner*, 666 F.3d 79, 82 (2d Cir. 2012); *United States v. Julius*,

610 F.3d 60, 64 (2d Cir. 2010).[7] In yet other decisions, we simply reviewed factual

findings for clear error, without viewing the evidence in favor of either party,

prevailing or not, and we reviewed conclusions of law and mixed questions of

---

[7] We recognized this apparent conflict in *United States v. Wilson*, but we declined to resolve it "because the outcome would [have been] the same under each standard of review." 699 F.3d 235, 242 n.3 (2d Cir. 2012).

fact and law *de novo*. *See, e.g.*, *United States v. Raymonda*, 780 F.3d 105, 113 (2d Cir. 2015); *Jiau*, 734 F.3d at 151; *United States v. Lopez*, 547 F.3d 397, 399 (2d Cir. 2008); *United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2006). Hence, we have taken three different approaches in reviewing decisions granting motions to suppress.[8]

The government's position -- that we should view the evidence in the light most favorable to it even when it is not the prevailing party -- does not make sense and we reject it. Only a few of our decisions have held as such, the first of which was *United States v. Howard*, 489 F.3d 484, 490 (2d Cir. 2007). In *Howard*, we reviewed a district court's *grant* of a motion to suppress and held that we view the district court's factual findings "in the light most favorable to the government," even though the government was not the prevailing party. *Id.* In support of this proposition, the *Howard* panel cited *United States v. Casado*, 303 F.3d 440, 443 (2d Cir. 2002). In *Casado*, however, we reviewed a district court's *denial* of the defendant's motion to suppress, and accordingly we viewed the

---

[8] We note that a fourth approach -- to view the evidence in the light most favorable to the district court's decision -- has been adopted by some courts. *See, e.g.*, *United States v. Yeary*, 740 F.3d 569, 579 n. 25 (11th Cir. 2014) ("We consider the evidence in the light most favorable to the District Court's judgment."); *United States v. Santistevan*, 701 F.3d 1289, 1292 (10th Cir. 2012) ("Upon review of an order granting a motion to suppress, we accept the district court's factual findings unless clearly erroneous, viewing the evidence in the light most favorable to the district court."). This approach, however, has never been adopted by this Court.

-12-

evidence in the government's favor. *Casado*, 303 F.3d at 443 (holding that, where district court denied motion to suppress, "we view [the district court's factual findings] in the light most favorable to the government"). [9] *Howard*'s inadvertent misapplication of *Casado* spawned a pair of cases that diverged from our longstanding precedent. *See Barner*, 666 F.3d at 82 (citing *Howard* and *Julius*); *Julius*, 610 F.3d at 64 (citing *Howard*). We conclude that these decisions applied the incorrect standard in reviewing a district court's grant of a motion to suppress, and that they are inconsistent with our long-established precedent.[10]

We think the better approach is to review the district court's findings of fact for clear error without viewing the evidence in favor of either party, and to review its conclusions of law and mixed questions of law and fact *de novo,* as we did in, *e.g., Raymonda*, 780 F.3d at 113; *Jiau*, 734 F.3d at 151; *Lopez,* 547 F.3d at 399; and *Irving*, 452 F.3d at 123 .[11] Generally, our cases have applied the light

---

[9]     In turn, *Casado* cited *United States v. Peterson*, 100 F.3d 7, 11 (2d Cir. 1996), which also involved the *denial* of a motion to suppress.

[10]     We have, on occasion, clarified prior decisions to address purported conflicts. *See United States v. Pujana-Mena*, 949 F.2d 24, 27-28 (2d Cir. 1991) (clarifying "seemingly contradictory rulings from this court"); *United States v. Ingredient Technology Corp.*, 698 F.2d 88, 99 (2d Cir. 1983) (clarifying prior holdings that were "simply pure oversight").

[11]     Many of our sister circuits similarly employ this standard of review. *See, e.g., United States v. Thurmond*, 782 F.3d 1042, 1044 (8th Cir. 2015) ("In an appeal of a district court's denial of a motion to suppress, we review the court's findings of fact for

most favorable standard in three situations: (1) review of a grant of a motion to dismiss under Fed. R. Civ. P. 12 (b)(6), where we assume the facts alleged in the complaint to be true and we draw all reasonable inferences in favor of the plaintiff; (2) review of a grant of a motion for summary judgment under Fed. R. Civ. P. 56, where we resolve all factual disputes and draw all reasonable inferences in favor of the non-moving party; and (3) review of a general verdict rendered by a jury, which entitles the prevailing party to have the evidence and reasonable inferences drawn therefrom viewed in its favor. *See Patane v. Clark*, 508 F.3d 106, 111 (2d Cir. 2007) (per curiam) (reviewing district court's decision to dismiss a complaint for failure to state a claim); *Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 77 (2d Cir. 2006) (reviewing jury verdict); *Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 260 (2d Cir. 2005) (reviewing district court's grant of summary judgment). In the first two scenarios, the trial court has not made factual findings and the decision is based on one side's factual assertions or evidence, and in the third scenario, the jury likewise has not made specific factual findings but has rendered only a general verdict.

clear error and its legal determinations de novo."); *United States v. Carrigan*, 724 F.3d 39, 45 (1st Cir. 2013) ("In reviewing the denial of a motion to suppress, we will review findings of fact for clear error and legal conclusions *de novo*."); *United States v. Rodgers*, 656 F.3d 1023, 1026 (9th Cir. 2011) ("We review de novo the district court's denial of the motion to suppress, but review the court's underlying findings of fact for clear error.").

Where a district court has made factual findings and drawn reasonable inferences in granting or denying a motion to suppress, it does not make sense for us to view the evidence in favor of either side on appeal. Indeed, it would be difficult to review a finding of fact for clear error while viewing the evidence underlying that fact in favor of either party. When reviewing for clear error, we may reverse only if we are "left with the definite and firm conviction that a mistake has been committed," *Andino*, 768 F.3d at 98, and "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous," *United States v. Murphy*, 703 F.3d 182, 188 (2d Cir. 2012). A requirement that the evidence be viewed in favor of one side or the other would be at odds with the notion that deference must be given to the factfinder's view of the evidence, and, for example, where there are two permissible views of the evidence, the less favorable of the two would not be clearly erroneous.

In the end, however, in this case we need not decide whether, when reviewing a district court's factual findings on a motion to suppress, we should view the evidence in the light most favorable to the prevailing party or we should simply review for clear error without construing the evidence in favor of the prevailing party, for Bershchansky would prevail under either standard of

review.  Accordingly, while we reject the government's position that the evidence should be viewed in its favor even though it did not prevail below, we need not decide between the two remaining views.

**B.**    *The Scope of the Search Warrant*

   **i.**    *Applicable Law*

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  Police officers must first obtain a warrant before they search a person's home, unless exigent or other circumstances justify a warrantless search.  *Andino*, 768 F.3d at 98.  Search warrant procedures are not mere formalities; they protect against "indiscriminate searches and seizures."  *Payton v. New York*, 445 U.S. 573, 583 (1980); *see also McDonald v. United States*, 335 U.S. 451, 455 (1948).  Indeed, the Fourth Amendment requires that the search warrant describe with particularity the place to be searched and the items to be seized.  *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011); *accord United States v. Clark*, 638 F.3d 89, 102 (2d Cir. 2011).  This particularity requirement protects individuals from "exploratory rummaging" not supported by probable cause.  *United States v. Galpin*, 720 F.3d 436, 445 (2d

Cir. 2013) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)); *accord*

*United States v. McCargo*, 464 F.3d 192, 196 (2d Cir. 2006).

"In determining the permissible scope of a search that has been

authorized by a search warrant . . . we must look to the place that the magistrate

judge who issued the warrant intended to be searched [and] not to the place that

the police intended to search when they applied for the warrant." *United States v.*

*Voustianiouk*, 685 F.3d 206, 211 (2d Cir. 2012). We look directly to the text of the

search warrant to determine the permissible scope of an authorized search. *See*

*Groh v. Ramirez*, 540 U.S. 551, 561 (2004) ("The mere fact that the Magistrate

issued a warrant does not necessarily establish that he agreed that the scope of

the search should be as broad as the affiant's request.").

ii.    *Application*

It is apparent from the face of the warrant, as well as Raab's

supporting affidavit, that the magistrate judge authorized the search of

Apartment 2 and no other apartment. The finding of probable cause was

predicated on evidence that child pornography was being made available on a

computer with an IP address that Raab believed was associated with a user in

Apartment 2. Raab repeatedly referred to Apartment 2 in his affidavit, and he

represented that he received confirmation from Cablevision, Con Edison, and

-17-

Anna Klishina that Apartment 2 was the apartment in question. Indeed, Apartment 2 was the only apartment that the magistrate judge could have authorized because the warrant application submitted by Raab referenced no other apartment and did not provide probable cause to search any other apartment. We conclude, as did the district court, that when the agents searched Apartment 1 rather than Apartment 2, they searched an apartment that the magistrate judge did not authorize them to search. When they did so, they conducted a warrantless search in violation of the Fourth Amendment.

The government contends that the warrant authorized the search of *Bershchansky's* apartment, notwithstanding the erroneous apartment number, because the physical description of Bershchansky's apartment was partially correct. We reject the argument. First, the warrant did not authorize a search of Bershchansky's apartment, but rather it authorized the search of Apartment 2. Indeed, the warrant itself makes no reference to Bershchansky at all. Second, although the warrant described the apartment "to the right," it clearly specified Apartment 2. The designation of the apartment number, under the circumstances, was a marker at least as specific and meaningful as the words "to the right."

This case differs from those in which courts have held warrants valid despite erroneous address numbers. *E.g.*, *United States v. Brobst*, 558 F.3d 982, 992 (9th Cir. 2009); *United States v. Turner*, 770 F.2d 1508, 1510-11 (9th Cir. 1985); *United States v. McCain*, 677 F.2d 657, 660-61 (8th Cir. 1982); *State v. Blackburn*, 511 P.2d 381, 385 (Or. 1973).  In those cases, other information in the warrant (or the executing officers' knowledge) strongly indicated a particular location other than the misidentified address.  Here, in contrast, the warrant could be read by a reasonable officer as indicating either of two apartments -- "[A]partment 2" or the apartment "to the right."  Significantly, most of the government's evidence in the warrant application pointed to "[A]partment 2."[12] Under the circumstances and in light of the warrant application, therefore, the apartment number was the more salient descriptor of the location to be searched.

We have previously noted that it may be "enough if the description is such that the officer[s] armed with a search warrant can with reasonable effort ascertain and identify the place intended."  *Velardi v. Walsh*, 40 F.3d 569, 576 (2d Cir. 1994) (internal quotation marks omitted).  Even if the likelihood of error was

---

[12]  *See Bershchansky*, 958 F. Supp. 2d at 379 ("Given that the government's showing of probable cause in Agent Raab's affidavit derived from the identification of a specific computer's IP address at [A]partment 2, and a neighbor's purported statement that the defendant resided in [A]partment 2, this court finds that [the magistrate] necessarily intended for the government to search [A]partment 2.").

roughly 50%, however, that is too great a risk under the law, which requires "no reasonable probability of searching another premises in error." *Id.* (emphasis omitted). Here, however, based on the information known to Raab, the agents could not have reasonably concluded that Bershchansky actually lived in Apartment 1 and that they were authorized to search Apartment 1.

Our conclusion is supported by our decision in *Voustianiouk*, which involved similar facts. Indeed, the same agent -- Raab -- was at the center of that case. In *Voustianiouk*, Raab obtained a warrant to search the first floor apartment at a location, but when he discovered that the suspect lived on the second floor, he instead searched the second floor apartment without obtaining further authorization to do so. 685 F.3d at 208. We held that, consequently, the agents conducted a warrantless search of the second floor apartment, in violation of the Fourth Amendment. *See id.* at 208, 211, 214.

**C.** *Good Faith*

We turn to the good faith exception to the exclusionary rule.

**i.** *Applicable Law*

To safeguard Fourth Amendment rights, the Supreme Court created "an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial." *Herring v. United States*, 555 U.S. 135, 139 (2009). The

exclusionary rule's "prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures." *United States v. Calandra*, 414 U.S. 338, 347 (1974). The rule specifically deters "deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Herring*, 555 U.S. at 144. Exclusion extends to both physical evidence and indirect products of unlawful searches, including "verbal evidence which derives so immediately from an unlawful entry." *Wong Sun v. United States*, 371 U.S. 471, 485 (1963). A determination that a Fourth Amendment violation occurred, however, does not automatically require the suppression of all physical evidence seized or statements derived from that illegal search. Suppression is "our last resort, not our first impulse." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006).

In *United States v. Leon*, the Supreme Court set out an exception to the exclusionary rule for a search conducted in good faith reliance upon an objectively reasonable search warrant. 468 U.S. 897, 925 (1984). The good faith reliance exception recognizes that if "the officer is acting as a reasonable officer would and should act in similar circumstances," *id.* at 920 (citation omitted), excluding the evidence would serve little deterrent purpose. Thus, the good-faith inquiry here "is confined to the objectively ascertainable question whether a

reasonably well trained officer would have known that the search was illegal in light of all of the circumstances." *Herring*, 555 U.S. at 145 (internal quotation marks omitted). "The burden is on the government to demonstrate the objective reasonableness of the officers' good faith reliance" on an invalidated warrant. *United States v. George*, 975 F.2d 72, 77 (2d Cir. 1992); *accord United States v. Santa*, 180 F.3d 20, 25 (2d Cir. 1999). Additionally, evidence should be suppressed only "where the benefits of deterring the [g]overnment's unlawful actions appreciably outweigh the costs of suppressing the evidence." *United States v. Ganias*, 755 F.3d 125, 136 (2d Cir. 2014).

### ii. *Application*

We conclude that the search of Bershchansky's apartment was not objectively reasonable and that the agents could not have relied on the warrant in good faith. We also hold that the benefits of deterring the agents' unlawful conduct outweigh the costs of suppressing the evidence obtained.

First, the warrant clearly authorized the search of Apartment 2, and yet the agents searched Apartment 1. As the district court observed, "[t]he evidence suggests that the officers ignored the warrant's clear authorization to search only [A]partment 2 and searched an apartment they were not authorized to search." *Berschchansky*, 958 F. Supp. 2d at 381. A reasonable police officer

would have recognized that the warrant authorized a search only of Apartment 2, he would not have proceeded to search an unauthorized apartment, and he would have called the magistrate judge for permission to search Apartment 1. Rather than obtain authorization to search Apartment 1, the agents bypassed constitutionally-mandated procedure and took a shortcut. *See Groh*, 540 U.S. at 563 ("It is incumbent on the officer executing a search warrant to ensure the search is lawfully authorized and lawfully conducted.").

Second, the government's assertion that the agents acted in good faith is undercut by Raab's repeated erroneous and conflicting statements. He claimed to have confirmed with Anna Klishina that Bershchansky and his mother lived in Apartment 2. Yet, Svetlana Klishina "credibly testified that she only heard her teenage daughter tell agents that 'downstairs live a mother with a son'" and, as the district court found, it would have made "no sense for Ms. Klishina's daughter, who live[s] in [A]partment 2, to tell Agent Raab that Mr. Bershchansky lived in [A]partment 2." *Berschchansky*, 958 F. Supp. 2d at 381. Raab also asserted that he orally confirmed with Con Edison that the bill for Apartment 2 was in Bershchansky's name, when the Con Edison records later showed that Bershchansky was not, in fact, listed as living in Apartment 2. Further, Raab confirmed that when he executed the warrant, he did not "notice

any numbers on the door that were inconsistent with the warrant." G. App. at 83. Yet, in his warrant application, he stated unequivocally that the door to the right bore "the number '2462 2.'" G. App. at 171. Moreover, the photographs -- which were received into evidence at the government's request -- show that the door to Bershchansky's apartment was clearly marked with a large numeral "1."[13]

Third, the government's suggestion that the description of the apartment in the warrant was sufficient to have permitted the agents to believe in good faith that they were authorized to search Bershchansky's apartment, in essence without regard to the apartment number, fails. The warrant did not mention Bershchansky by name, and while it provided some limited physical description of the premises, the apartment to be searched was not otherwise described with "sufficient particularity so that there was no reasonable probability that an incorrect premises might be accidentally searched." *Bershchansky*, 958 F. Supp. 2d at 381. And, of course, the most prominent part of the description was the apartment number. Therefore, the agents could not have

---

[13]        In his hearing testimony, Raab steadfastly insisted that he could not recall whether there was a number on the door of the apartment they searched; he could not recall where he got the number "2" from to put into the search warrant application, and he could not recall what he thought in terms of the apartment number as he entered. Of course, the apartment number was critical to the agents as they were executing a warrant to search a particular apartment, and Raab's purported failure to recall these critical facts is telling.

"reasonably relied on the description in conducting a search" of what turned out to be Apartment 1. *Voustianiouk*, 685 F.3d at 212 n.1.

We agree with the district court that the agents' "significant errors constitute the type of 'conduct that is sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the [price] paid by the justice system.'" *Bershchansky*, 958 F. Supp. 2d at 381 (quoting *Voustianiouk*, 685 F.3d at 216). We underscore that Raab was the agent who prepared the warrant. Because Raab was also the effectuating officer, he cannot now claim that he reasonably relied on the deficient warrant he submitted. *See Groh*, 540 U.S. at 564 (2004) ("Moreover, because petitioner himself prepared the invalid warrant, he may not argue that he reasonably relied on the Magistrate's assurance that the warrant contained an adequate description of the things to be seized and was therefore valid.").

Moreover, as noted above, Raab was also the lead agent in *Voustianiouk*, where the agents took a "shortcut" instead of obtaining a new search warrant for the defendant's actual apartment. 685 F.3d at 208. Raab's "recurring" conduct further supports the application of the exclusionary rule to the circumstances of this case. *Herring*, 555 U.S. at 144 ("[T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some

circumstances recurring or systemic negligence.").  Exclusion is proper here "to compel respect for the constitutional guaranty."  *Elkins v. United States*, 364 U.S. 206, 217 (1960).  We agree with the district court that the benefits of deterring the government's conduct here appreciably outweigh the costs of suppression.

## *CONCLUSION*

For the reasons set forth above, the order of the district court is AFFIRMED.