# United States Court of Appeals
## For the First Circuit

No. 20-2024

UNITED STATES OF AMERICA,

Appellee,

v.

KADEEM PIMENTEL,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Howard, Chief Judge,
Lipez and Gelpí, Circuit Judges.

Jessica P. Thrall, Assistant Federal Public Defender, on brief for appellant.
Nathaniel R. Mendell, Acting United States Attorney, and Donald C. Lockhart, Assistant United States Attorney, on brief for appellee.

February 17, 2022

**GELPÍ, Circuit Judge.** On August 31, 2018, around 2:30 a.m., officers of the Haverhill Police Department ("HPD") executed a no-knock search warrant for "88 Fountain St. 2nd floor," following reports of shots discharged hours before. The police found two shotguns and related paraphernalia in the bedroom of defendant-appellant Kadeem Pimentel ("Pimentel"), which was on the third floor of the building. Pimentel filed a motion to suppress, arguing, inter alia, that the police exceeded the scope of the warrant by searching his third-floor bedroom. The district court denied Pimentel's motion, finding that the good-faith exception to the exclusionary rule applied. Pimentel subsequently pleaded guilty to being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and was sentenced to a term of imprisonment of 26 months, followed by a three-year supervised release term. He appeals the denial of his suppression motion, contending that the search violated the Fourth Amendment and fell outside of the good-faith exception articulated in United States v. Leon, 468 U.S. 897 (1984). We affirm.

## I. Background[1]

The HPD received a phone call on the evening of August 30, 2018, indicating that shots had been fired at Pimentel close

---

[1] "[W]hen we review a challenge to a district court's denial of a motion to suppress, we are to 'view the facts in the light most favorable to the district court's ruling' on the motion." United States v. Rodríguez-Pacheco, 948 F.3d 1, 3 (1st Cir. 2020)

to 88 Fountain Street. Pimentel reported to the police arriving at the scene that, while he was sitting in a truck, a man in a passing car shot him. Pimentel had bloody bruises on his right thigh and the right leg of his shorts was shredded. While he received medical treatment, however, a neighbor approached the officers and provided a video of the incident indicating that the gunshot was in fact fired from the same truck in which Pimentel had been sitting. Confronted about the video, Pimentel revised his original account and claimed instead that he had been shot through the front side window by another passenger of the truck. The police subsequently questioned the owner of the truck, who stated that Pimentel himself had fired the shot and that he regularly carried a long gun in his waistband. The officers also noted that Pimentel's injuries were consistent with a downward shot fired from his waist. Based on the truck owner's description, the police also determined that the weapon was likely a sawed-off shotgun.

That evening, an HPD officer applied for and received a no-knock search warrant for 88 Fountain Street to look for shotguns and related property, including "any items that pertain to firearms

---

(quoting United States v. Camacho, 661 F.3d 718, 723 (1st Cir. 2011)). Therefore, we have "narrate[d] the facts based upon the district court order and any other reliable evidence in the motion to suppress record." United States v. Manubolu, 13 F.4th 57, 60 n.1 (1st Cir. 2021). Here, the parties appear to agree on the relevant facts, but dispute their legal implications.

and proof of residency." Regarding the person, place, or location to be searched, the warrant specified that "88 Fountain St. 2nd floor is a 3 story, multi-unit building, with a basement, numbered 88 on the left side of the front deck . . . which is occupied by and/or in possession of Kadeem Dashawn Pimentel, Maya Garrow [Pimentel's girlfriend], Diana Pimentel [Pimentel's aunt], and Phebe Pimentel [Pimentel's grandmother]." The notation "2nd floor" was not included in the original warrant application; rather, it was added in handwriting at the request of the issuing judge's clerk, who had sought clarification regarding where in the building Pimentel lived. This notation was based on HPD records of Pimentel's residence based on prior police encounters with him. The affidavit supporting the warrant application similarly stated that Pimentel lived on the second floor and specified that the HPD requested a warrant for "88 Fountain St, 2nd floor." The approved warrant also authorized a search for property "on the person or in the possession of . . . Kadeem Dashawn Pimentel, Maya Garrow, Diana Pimentel, and Phebe Pimentel."

88 Fountain Street is a three-story building that is jointly owned by Pimentel's grandfather and great-uncle. For most of his life, Pimentel had lived at 88 Fountain Street. Shortly prior to the search, he moved from the second floor of the building to the third floor, where his aunt Diana and her boyfriend also resided. At the time of the search, Pimentel's great-uncle resided

- 4 -

on the first floor, while other members of Pimentel's family, including Pimentel's mother and grandmother, resided on the second floor. Each floor receives its own utility bill and is equipped with a separate living space, accessible through a door with a lock, located off a common hallway or stairwell. At some point in the past, the Pimentels had rented out the third floor to a different family who attended their church. A common staircase at the back of the building also connects the floors via rear doors, which are not always kept locked. The exterior of the building has three doorbells and mailboxes corresponding to the three floors of the building, although Diana Pimentel's name remained listed on the second-floor mailbox despite her residence on the third floor.

Around 2:30 a.m. on August 31, approximately ten HPD officers executed the search warrant, breaching both the front door of the building and the locked entrance door of the second floor. The officers secured the residents of the second floor, apart from Pimentel's bedridden great-grandmother, in the second-floor living room. Subsequently, an HPD officer entered the back stairwell of the building through an open door in the second-floor kitchen. The officer encountered Pimentel halfway between the second and third floors, heading downstairs. Pimentel informed the officer that his girlfriend, Garrow, was also upstairs. The officer then directed Pimentel to join the others in the second-floor living room. HPD officers proceeded to enter the third floor

and brought Garrow and two other residents (Diana Pimentel and her boyfriend) to the second floor. After being advised of his Miranda rights, Pimentel acknowledged that he had two shotguns in his bedroom, which the officers understood to be on the third floor based on the stairwell encounter with him and Garrow's presence there. Subsequently, officers searched the third floor and recovered two shotguns and related paraphernalia from Pimentel's bedroom. None of the residents of the third floor had a firearms license, and none consented to a search of the third floor.

Pimentel was subsequently indicted in federal court for being a felon in possession of firearms in violation of 18 U.S.C. § 922(g)(1). Thereupon, he moved to suppress the items seized in the third-floor search, arguing that the search warrant had authorized only a search of the unit's second floor, and that the officers had violated the Fourth Amendment by searching the third floor.[2] Pimentel did not dispute that the police had established probable cause, or otherwise assert that the warrant was facially deficient.

The district court denied the motion. It agreed with Pimentel's argument that the second- and third-floor apartments were distinct units, but nevertheless found that the officers acted in good faith in searching the third-floor bedroom, relying on the

---

[2] Pimentel also sought suppression of incriminating statements he made under questioning. This issue is not before us on appeal.

reasoning of this court in United States v. Woodbury, 511 F.3d 93 (1st Cir. 2007). In so finding, the court bypassed what it called the "complex issue" of whether the warrant exclusively authorized a search of the second floor. Rather, it determined that, even if the warrant was so limited, the officers nevertheless acted in a good-faith belief that the same authorized them to search Pimentel's third-floor bedroom.

## II. Discussion

On appeal, Pimentel challenges the denial of his suppression motion, arguing that the third-floor search was unauthorized by the warrant and that the good-faith exception to the exclusionary rule is inapplicable. Upon close examination, we hold otherwise. On the record before us, the context in which the search was conducted -- combined with the textual ambiguity present on the face of the warrant -- is sufficient to conclude that the search was carried out in good faith within the purview of Leon.

## A. Standard of Review

When reviewing a district court's denial of a motion to suppress, we assess factual findings for clear error and evaluate legal issues de novo. United States v. Tiru-Plaza, 766 F.3d 111, 114-15 (1st Cir. 2014). "In assessing these legal conclusions, however, we also give appropriate weight to the inferences drawn by the district court and the on-scene officers, recognizing that they possess the advantage of immediacy and familiarity with the

witnesses and events." Id. at 115. Moreover, "we will uphold a district court's decision to deny a suppression motion provided that any reasonable view of the evidence supports the decision." United States v. Ferreras, 192 F.3d 5, 10 (1st Cir. 1999) (citing United States v. García, 983 F.2d 1160, 1167 (1st Cir. 1993)).

## B. **The Good-Faith Exception**

The Fourth Amendment's prohibition of "unreasonable searches and seizures" protects against unwarranted government intrusions into one's person and property. U.S. Const. amend. IV. The exclusionary rule provides that evidence seized in violation of the Fourth Amendment is ordinarily remedied by suppression. See United States v. Brunette, 256 F.3d 14, 19 (1st Cir. 2001). However, because suppression can impose a significant social burden, the exclusionary rule is not ironclad. Leon, 468 U.S. at 907. Instead, courts must consider "the flagrancy of the police misconduct at issue" in deciding whether the exclusionary rule applies. Id. at 911. "For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." Davis v. United States, 564 U.S. 229, 237 (2011). As the Supreme Court has made clear in a line of cases beginning with Leon, this cost-benefit analysis is not satisfied when an officer acts in "objective good faith" such that any "marginal or nonexistent benefits produced by suppressing evidence . . . cannot justify the substantial costs of exclusion." Leon, 468 U.S. at 920, 922.

As a threshold matter, the parties dispute whether the Leon good-faith exception applies to an allegation that the execution of a search warrant exceeded the warrant's scope. In questioning Leon's applicability, Pimentel relies in part on a footnote in Leon in which the Court noted that its "discussion of the deterrent effect of excluding evidence obtained in reasonable reliance on a subsequently invalidated warrant assumes, of course, that the officers properly executed the warrant . . . ." Id. at 918 n.19. But subsequent caselaw makes clear that the good-faith exception also applies "across a range of cases," including where the alleged error derives from the police rather than the warrant's issuing magistrate. Davis, 564 U.S. at 238; see also Herring v. United States, 555 U.S. 135, 147 (2009) (holding that the good-faith exception may apply "when police mistakes are the result of negligence . . . rather than systemic error or reckless disregard of constitutional requirements").

Accordingly, Pimentel's claim that the HPD exceeded the scope of the search warrant does not itself foreclose the application of the good-faith exception. See, e.g., Maryland v. Garrison, 480 U.S. 79, 86 (1987) (applying the good-faith exception to "a search that turned out to be ambiguous in scope"); see also Rawlings v. Kentucky, 448 U.S. 98, 110 (1980) ("[W]hile the officer's belief about the scope of the warrant they obtained may well have been erroneous . . . the conduct of the police here does

not rise to the level of conscious or flagrant misconduct requiring prophylactic exclusion of petitioner's statements."); United States v. Grisanti, 943 F.3d 1044, 1051 (7th Cir. 2019) (relying on Rawlings to conclude that the good-faith exception applied where "the agents did not unreasonably exceed the scope of the warrant").[3]

In questioning the applicability of Leon, Pimentel also points to cases in which courts have declined to apply the exception to searches that went beyond the scope of a warrant. To this end, Pimentel highlights dicta in United States v. Fuccillo, 808 F.2d 173 (1st Cir. 1986), where we stated that "[t]he good faith exception [] will not be applied unless the officers executing search warrants, at the very minimum, act within the scope of the warrants and abide by their terms." Id. at 177. However, the good-faith exception did not apply in Fuccillo because the facts did not support a finding of good faith, not because it

_____

[3] Pimentel attempts to distinguish Rawlings on the ground that the case specifically addressed the exclusion of statements that the defendant had made following an allegedly illegal detention, rather than suppression of evidence seized as the fruit of an improperly executed warrant. Rawlings, 448 U.S. at 109-10. However, the officers' belief about the scope of the warrant directly related to the propriety of the detention, and the Court saw fit to emphasize that the officers' possible error in this regard was not, under the circumstances, sufficiently grave to mandate exclusion of the incriminating statements. We thus agree with the Seventh Circuit that Rawlings provides persuasive authority for the analogous inquiry into whether evidence should be suppressed when seized pursuant to an alleged scope violation.

would have been categorically impermissible to apply the exception to a warrant's execution. Crucially, the warrant in Fuccillo was unambiguous in its scope, and there was no question that the officers' conduct went well beyond what had been authorized. Id. at 177-78 (noting that "agents seized, in addition to the authorized cartons of *women's* clothing, racks of clothing, empty boxes, and, most disturbingly, two racks of *men's* clothing"). Fuccillo shows that searches clearly exceeding the scope of an unambiguous warrant cannot be saved by the good-faith exception. It does not indicate, however, that defendants can make an end-run around Leon simply by alleging a scope violation or another defect in a warrant's execution.

The upshot is that when we have found that an improperly executed warrant fails to satisfy the good-faith exception, we have done so only "[i]n view of the facts before us . . . ." Id. at 178. We have not bypassed the inquiry into good faith altogether. See id. at 177 ("Applying [Leon's] principles to the searches and seizures at [issue] . . . it is clear to us that the agents executing the warrants did not act in good faith as that term was explained in Leon.").[4] As the good-faith exception only

_____

[4] Pimentel also relies on two Tenth Circuit cases, United States v. Angelos, 433 F.3d 738 (10th Cir. 2006) and United States v. Medlin, 798 F.2d 407 (10th Cir. 1986), which suggest that Leon does not apply to an improperly executed warrant. However, neither case involved a situation similar to the one before us, where there was an ambiguity on the face of the warrant such that the officers

- 11 -

saves searches "that it was reasonable to believe were covered by the warrant," Leon, 468 U.S. at 918 n.19, our inquiry here turns on whether the HPD officers' belief that the search warrant covered the third floor was objectively reasonable under the circumstances.

## C. **The Third-Floor Search**

"Whether a search exceeds the scope of a search warrant is an issue we determine through an objective assessment of the circumstances surrounding the issuance of the warrant, the contents of the search warrant, and the circumstances of the search." United States v. Hitchcock, 286 F.3d 1064, 1071 (9th Cir.), amended on other grounds, 298 F.3d 1021 (9th Cir. 2002). Determinations of good faith similarly do not follow a bright-line test, but are made "when government agents rely on a warrant in objective good faith and in the interest of justice suppression is generally inappropriate." United States v. Woodbury, 511 F.3d 93,

---

might have reasonably believed they were following the warrant's terms. See Angelos, 433 F.3d at 746 (finding that the warrant was "without ambiguity" and that, accordingly, "the agents executing the warrant . . . reasonably should have noticed its limited scope" and "cannot be said to have acted reasonably"); Medlin, 798 F.2d at 411 (acknowledging that the government's seizures went beyond the clear scope of the warrant but remanding to assess whether the seizures were lawful under the plain view doctrine, and if not, whether any misconduct was so "flagrant" as to justify suppression of all the evidence). These cases demonstrate that the Leon exception will not apply when -- on the facts of the case -- officers clearly or unreasonably exceed the scope of a warrant. However, they do not show that Leon is categorically inapplicable whenever the propriety of a warrant's execution is disputed.

- 12 -

99 (1st Cir. 2007). Upon close examination of the language of the warrant and the overall circumstances of the search, we hold that the HPD officers reasonably believed that the warrant authorized them to search the third floor, and thus the Leon good-faith exception applies.[5]

The government argues on appeal that the language of the warrant itself, coupled with the discoveries made by the officers on the scene, generated a degree of ambiguity in the warrant's scope. The warrant described the place to be searched as follows: "88 Fountain St. 2nd floor is a 3 story, multi-unit building, with a basement, numbered 88 on the left side of the front deck. The building is colored white with white trim and red shutters and a red [] asphalt roof." The following line of the warrant, in reference to the place to be searched, added the phrase "which is occupied by and/or in possession of" Pimentel, his girlfriend, his aunt, and his grandmother. Separately, the warrant specified that the property to be searched includes "any items that pertain to firearms and proof of residency," without referencing the second

---

[5] We do not base this conclusion, as the government suggests, on the district court's finding that "the officers made a reasonable mistake in seeking a warrant that authorized a search of the second floor." The parties do not dispute the validity of the warrant itself, and the Fourth Amendment's particularization and probable cause requirements are not at issue in this case. As such, the HPD officers' reasonable -- if ultimately incorrect -- belief that Pimentel lived on the second floor does not bear on the propriety of their decision to search the third floor.

- 13 -

floor, and similarly authorized a search for property "on the person or in the possession of" Pimentel and the three other individuals identified above.

Pimentel argues that the phrase "which is occupied by . . . " must be read only to modify the phrase "88 Fountain St. 2nd floor," which he views as the sole location that the warrant authorized searching. The government instead suggests that the "which is occupied by" clause could reasonably be read more broadly, i.e., to permit a search of Pimentel's residence within the building even after such residence was discovered to be on the third floor. To support this reading, the government cites to the focus -- both elsewhere in the warrant and in the supporting affidavit -- on Pimentel himself and his suspected possession of a firearm.

The warrant here is not an exemplar of grammatical precision, and no reading of it is free from ambiguity. However, we are mindful that we do not subject warrants to the same exacting standard of textual rigor as we might demand in matters of statutory interpretation. Cf. O'Connor v. Oakhurst Dairy, 851 F.3d 69, 70 (1st Cir. 2017) ("For want of a comma, we have this case."). Instead, our caselaw instructs that "there is some breathing room in our analysis, since 'search warrants and affidavits should be considered in a common sense manner, and hypertechnical readings should be avoided.'" United States v.

Peake, 804 F.3d 81, 87 (1st Cir. 2015) (quoting United States v. Bonner, 808 F.2d 864, 868 (1st Cir. 1986)).  Here, a reasonable officer could understand the principal command of the warrant to authorize a search of Pimentel's person and residence within the building.  Thus, we believe that the warrant's text, in light of the context in which it was executed, was sufficiently ambiguous to support a finding of good faith.

The HPD officers' conduct and the on-the-scene discoveries they made "in the dangerous and difficult process of . . . executing [the] search warrant[]" also militate in favor of finding good faith.  Maryland v. Garrison, 480 U.S. 79, 87 (1987).  In their initial sweep of the premises, the officers encountered Pimentel coming down the back stairwell from the third-floor apartment, and discovered that Pimentel's girlfriend and aunt were also present in that same unit -- three of the four people enumerated in the warrant's "which is occupied by" clause. Further, by Pimentel's own admission, the officers learned that the shotguns that were the primary object of the warrant were in Pimentel's bedroom, which the officers correctly understood to be on the third floor.  It was thus only upon discovering that Pimentel's current bedroom and the whereabouts of the sought-after property were both on the third floor that the officers conducted the search at issue.  They did so while searching for dangerous and possibly loaded weapons -- one of which had been discharged

- 15 -

only hours previously -- and holding a warrant in hand that spoke of the premises "occupied by and/or in possession of" Pimentel and authorized a search of property "on the person or in the possession of" the same. Under these particular circumstances, we cannot say the HPD's behavior reflects the type of "lawlessness" that "requires application of the extreme sanction of exclusion." Leon, 468 U.S. at 916.[6]

As the district court noted, the instant case in many ways resembles United States v. Woodbury, 511 F.3d 93 (1st Cir. 2007), where we also applied the good-faith exception. In Woodbury, the police received a search warrant specifying the location to be searched as "#7 Leisure Lane Windham, Maine[,] believed to be the bottom floor left apartment." Id. at 95. Upon arriving at the bottom-floor apartment, however, the police were informed by that apartment's occupant that the defendant actually resided in a second-floor unit, and proceeded to search the latter

---

[6] Other contextual factors point toward the same conclusion. The officers knew that Pimentel had recently resided on the second floor. Using the back staircase that directly connected the second and third floors, they did not have to open any locked doors to access the third-floor unit. Thus, throughout the search, the officers encountered a multigenerational living situation in a family-owned and family-occupied dwelling. To be sure, we find no error in the district court's determination that the third-floor unit constituted a separate apartment from the second-floor unit. But these facts underscore that the officers' search of the third floor was not the sort of "deliberate, reckless, or grossly negligent conduct" that "the exclusionary rule serves to deter." Herring v. United States, 555 U.S. 135, 144 (2009).

apartment.  Id.  The defendant moved to suppress the evidence recovered in the search, including a firearm and drug paraphernalia, arguing in relevant part that the officers acted outside the scope of the warrant in searching the upstairs apartment.  Id. at 96.  We upheld the district court's denial of said motion.  Despite the warrant's misidentification of the bottom-floor apartment, we emphasized that the police "were able to execute the warrant against their intended target."  Id. at 99.  In doing so, they "made clear their good faith" by focusing their search on the defendant's apartment, as the warrant had clearly anticipated.  Id. at 100.

Here, as in Woodbury, the officers possessed a warrant to search the defendant's apartment, supported by an affidavit that focused on his suspected possession of contraband, but learned on the scene that the warrant had specified a different area of the dwelling.  Moreover, in Woodbury, we did not rely on the warrant's "believed to be" qualification in finding the search had been made in good faith.  Rather, we stated that it was "plain from the face of the warrant[] that the wrong unit was specified on the warrant."  Id. at 98-99.  However, despite "listing the wrong unit, the warrant made clear reference to the apartment

occupied by" the defendant.  Id. at 100.  On the facts of the case, this sufficed for Leon to cover the officers' search.  Id.[7]

The same logic applies to the case at bar.  While the warrant referenced 88 Fountain Street's second-floor apartment, instead of the third-floor unit to which Pimentel had recently relocated, both the warrant and supporting affidavit identified him by name, and the warrant directed the officers toward the apartment "which is occupied by" him.  Indeed, whereas in Woodbury the police learned of the error from an unknown third party, the officers here were able to ascertain from their own encounter with Pimentel both that he resided on the third floor and that the weapons they sought were located there.  In searching the third-floor unit, the officers acted "consistent with a reasonable effort to ascertain and identify the place intended to be searched." Garrison, 480 U.S. at 88.  Given the overall context of this search, and "judge[d] . . . in light of the information available

---

[7] Caselaw in other circuits regarding searches of misidentified apartments has often pursued a similar line of reasoning.  See, e.g., United States v. Owens, 848 F.2d 462, 463, 465 (4th Cir. 1988) (finding good faith where "[t]he affidavit supporting this search warrant set forth facts [indicating that defendant] . . . exercised control over this apartment" and where "[t]he affidavit clearly identified the apartment to be searched as one that was occupied [by defendant]"); United States v. Clement, 747 F.2d 460, 461 (8th Cir. 1984) (declining to "conclude that the inaccurate address in the warrant should operate to invalidate the search" where "the search warrant named the correct street number" and "specifically named [defendant's] residence").

- 18 -

to them at the time they acted," we hold the officers' conduct to be covered by the Leon good-faith exception.  Id. at 85.

Pimentel argues that Garrison in fact supports suppression.  In Garrison, the officers executing a warrant found contraband prior to realizing that there were two apartments contained within the premises described in the warrant, rather than one as they had initially believed.  480 U.S. at 87.  In upholding the search, the Court noted that "as the officers recognized, they were required to discontinue the search of respondent's apartment as soon as they . . . were put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant."  Id. at 87.  Pimentel relies on this language to claim that the HPD officers should have ended their search when they discovered that his bedroom was not on the second floor.  In parallel, Pimentel attempts to distinguish Woodbury by noting that the court there found evidence of good faith in the officers' declination to search the bottom-floor apartment mistakenly listed on the warrant.  See Woodbury, 511 F.3d at 100.

We are unpersuaded.  Pimentel's argument would appear to call into question the officers' search of the second-floor apartment, which is the only unit that might have been "erroneously included within the terms of the warrant" in the manner of Garrison or Woodbury.  Garrison, 480 U.S. at 87.  But Pimentel does not question the propriety of the second-floor search, and all the

evidence he seeks to suppress was recovered from the third floor. In any event, Pimentel had recently relocated from the second floor, and one of the parties listed on the warrant (Pimentel's grandmother) did reside on that floor. As such, the officers' search of both floors hardly evidences bad faith or constitutes one "of the wide-ranging exploratory searches the Framers intended to prohibit." Id. at 84. Rather, their actions reflected a reasonable interpretation of the command of the warrant, which authorized the recovery of firearms from Pimentel at the place he resided.

We likewise find inapposite Pimentel's reliance on Second Circuit caselaw, arising from very different contexts, where the court declined to find good faith. In United States v. Voustianiouk, 685 F.3d 206 (2d Cir. 2012), the court emphasized that the police, by listing only the apartment unit to be searched, "purposefully exclude[ed] any mention of [defendant's] name from the warrant and affidavit" and did not even "provide any basis for concluding that [defendant] may have been involved in a crime." Id. at 211. Accordingly, the court concluded that the search went beyond the issuing magistrate's intentions and exceeded the scope of the warrant. Id. In so holding, the court explicitly distinguished Woodbury by again highlighting that "[n]either the warrant nor the affidavit mentioned [defendant] as the occupant of

the apartment that officials were authorized to search." Id. at 215.

Similarly, in United States v. Bershchansky, 788 F.3d 102 (2d Cir. 2015), the Second Circuit declined to apply Leon where the "warrant itself ma[de] no reference to [defendant] at all." Id. at 111. The court further stated that the government's invocation of "good faith is undercut by [the agent's] repeated erroneous and conflicting statements," and, noting that the case involved the same agent as in Voustianiouk, found that the agent's "'recurring' conduct further supports the application of the exclusionary rule to the circumstances of this case." Id. at 113–14 (quoting Herring v. United States, 555 U.S. 135, 144 (2009)). No such misconduct is apparent here.

## III. Conclusion

We deal here with a particular situation in which officers were forced to respond to new information that was uncovered while executing an awkwardly worded warrant, and made a good-faith judgment about whether this search remained within the scope of the warrant. As this case involved a search of a three-unit, family-occupied dwelling, it may not be a useful analogue for cases involving searches of larger multi-unit buildings, or cases in which the building's occupants lack familial ties. On the record before us, we find that the officers reasonably believed

that the warrant permitted the search of Pimentel's third-floor bedroom.  Accordingly, the <u>Leon</u> exception applies.

**<u>Affirmed.</u>**