**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 24-4024**

UNITED STATES OF AMERICA,

Plaintiff - Appellant,

v.

JOSHUA LEE RAY,

Defendant - Appellee.

------------------------------

UNITED STATES NAVY-MARINE CORPS APPELLATE DEFENSE DIVISION,

Amicus Supporting Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk.  John A. Gibney, Jr., Senior District Judge.  (2:23-cr-00126-JAG-DEM-1)

Argued:  December 13, 2024                        Decided:  June 3, 2025
                        Amended: June 3, 2025

Before GREGORY, THACKER, and RUSHING, Circuit Judges.

Affirmed by published opinion.  Judge Thacker wrote the opinion in which Judge Gregory joined.  Judge Rushing wrote a dissenting opinion.

**ARGUED:** Jacqueline Romy Bechara, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellant.  Michael E. Rayfield, SHOOK, HARDY & BACON LLP, New York, New York, for Appellee. **ON BRIEF:** Jessica D. Aber, United States Attorney, Richmond, Virginia, Elizabeth M. Yusi, Assistant United States Attorney, Megan M. Montoya, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellant.  Andrew W. Grindrod, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Norfolk, Virginia, for Appellee.  Arthur L. Gaston III, Captain, JAGC, Division Director, Raymond E. Bilter, Lieutenant, JAGC, UNITED STATES NAVY, Washington, D.C.; Colin P. Norton, Captain, UNITED STATES MARINE CORPS, Washington, D.C., for Amicus Curiae.

––––––––––––

THACKER, Circuit Judge:

In October 2022, investigators with the Naval Criminal Investigation Service ("NCIS") obtained a military warrant to seize the cell phone of Joshua Lee Ray ("Appellee") -- but not to search it. In contravention of the express terms of that warrant, the investigators searched Appellee's phone and found evidence of child sexual abuse material.[1] Appellee moved to suppress the evidence, arguing that the search violated the Fourth Amendment because the warrant did not authorize the NCIS to search his phone. The district court granted Appellee's motion.

The Government appeals, conceding the warrant did not authorize the NCIS to search Appellee's phone, the NCIS had not received verbal authorization to search Appellee's phone, and the warrant did not incorporate an affidavit that requested authorization to search Appellee's phone. Despite all of this, the Government argues the search was justified pursuant to the good faith exception.

We hold that the Government may not rely on the good faith exception because the warrant was not deficient. As is plain is to anyone who reads the warrant, it simply did not authorize the NCIS to search Appellee's cell phone.

Therefore, as explained below, we affirm.

I.

Appellee served in the United States Navy as a communications engineer aboard the USS Gravely. On August 15, 2022, the father of Minor Victim 1 -- an eleven-year-old,

---

[1] *See United States v. Kuehner*, 126 F.4th 319, 322 n.1 (4th Cir. 2025).

autistic boy -- reported to the NCIS via telephone that Appellee had sexually assaulted his son while babysitting him three to four years prior. On the call, the father of Minor Victim 1 played an audio recording he had made of his son. On the recording, Minor Victim 1 asserted that Appellee would show him videos "of adult females engaged in oral sexual intercourse with adult males." J.A. 49.[2] Appellee would then have Minor Victim 1 perform oral sex on him.

Minor Victim 1 was approximately six to eight years old at the time of the alleged abuse, and it occurred between four to eighteen times. The NCIS immediately opened an investigation and assigned Special Agent Tiffany Smith as the case officer. Special Agent Smith in turn notified Commander Hunter Washburn, the commander of the USS Gravely, about the allegations against Appellee.

In September 2022, the NCIS conducted a forensic interview of Minor Victim 1 that corroborated his allegations. Minor Victim 1 alleged that Appellee showed him videos of "girl's sucking boy[']s d**ks." J.A. 49. According to Minor Victim 1, Appellee would make Minor Victim 1 watch these videos on Appellee's cell phone every time he made Minor Victim 1 perform oral sex. As Appellee attests in his brief, "[Minor Victim 1] did not claim that [Appellee] filmed the alleged abuse or used his phone to communicate about it." Appellee Br. at 4 (citing J.A. 20, 49, 127).

On September 22, 2022, Special Agent Smith interviewed Appellee at the NCIS field office in Norfolk, Virginia. Special Agent Smith informed Appellee that "he was

---

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

being investigated for child sexual abuse." J.A. 129. Appellee initially denied watching adult pornography in the presence of Minor Victim 1. He then hedged, and said "[i]f [Appellee] was watching adult pornography in the bathroom or maybe on the couch, there was a slight chance [Minor Victim 1] could have seen him viewing it." *Id.* at 130.

On September 23, 2022, Special Agent Smith called Commander Washburn and "discussed obtaining" a command authorization for search and seizure ("CASS"), the military equivalent of a search warrant. J.A. 132. Commander Washburn instructed Special Agent Smith to prepare a written CASS for him to sign before the search would commence. After the phone call, the USS Gravely went out to sea, with Appellee on it. While the ship was at sea, Special Agent Smith prepared the CASS and an affidavit in support of the CASS, which attached a narrative document outlining the factual basis for probable cause ("Attachment A").

On October 6, 2022, Special Agent Smith met with Commander Washburn to provide an "additional update on the case as well as to walk through the process of signing the CASS and what that was going to authorize in this case." J.A. 195. She swore, pursuant to Commander Washburn's administered oath, to both the affidavit and Attachment A. The affidavit "request[ed] authority to search . . . [Appellee]'s personal cellular device." *Id.* at 47. The affidavit incorporated Attachment A by reference.

Attachment A stated that there was "probable cause to believe the cell phone seized from [Appellee] contains information about or is evidence of Article 120b (Sexual Assault of a Child) of the [Uniform Code of Military Justice ('UCMJ')]." J.A. 49. It further stated that Special Agent Smith "intend[ed] to do a full extraction of the phone." *Id.* at 50. Upon

5

extraction, the NCIS would "only search for and seize information that constitutes fruits, contraband, evidence, or instrumentalities of violations of Article [] 120b (Sexual Assault of a Child) of the UCMJ." *Id.*

Critically, the CASS itself did not authorize a search of the phone. Instead, it asserted that there was probable cause to believe that Appellee's "[p]ersonal cellular telephone" was "concealed on [his] person." J.A. 46. In line with this, the CASS authorized the NCIS to search Appellee "for [his cell phone] and if the property [was] found there to seize it." *Id.* The CASS did not authorize the NCIS to search Appellee's cell phone. Nor did it incorporate the affidavit attested to by Special Agent Smith.

Commander Washburn signed the CASS on October 6, 2022. Special Agent Smith subsequently searched Appellee and seized his phone. Special Agent Smith then sent the phone to a Naval facility for processing and ordered a full digital forensic examination of the phone. The NCIS found no information pertaining to the abuse of Minor Victim 1 on the phone, but it did find evidence of child sexual abuse material. It also discovered evidence that Appellee had used a file shredding program to delete data from his phone following his initial interview with the NCIS. Special Agent Smith then sought and obtained a second CASS from Commander Washburn to search Appellee's phone for child sexual abuse material. That search yielded additional images and videos containing suspected child sexual abuse material.

In October 2023, a grand jury indicted Appellee in the Eastern District of Virginia based on the allegations from Minor Victim 1, and from two more minor victims, as well

6

as the searches of Appellee's phone.[3]  He was charged with five counts: (1) aggravated

sexual abuse of Minor Victim 1 in violation of 18 U.S.C. § 2241(c); (2) aggravated sexual

abuse of Minor Victim 2 in violation of 18 U.S.C. § 2241(c); (3) aggravated sexual abuse

of Minor Victim 3 in violation of  18 U.S.C. § 2241(c); (4) possession of child sexual abuse

material in violation of 18 U.S.C. § 2252(a)(4)(A); and (5) destruction, alteration, and

falsification of records in violation of 18 U.S.C. § 1519.

Appellee moved to suppress all evidence derived from the search of his phone

pursuant to the first CASS.  Appellee argued that according to its plain terms the CASS did

not authorize the search of Appellee's phone.  Appellee further argued that if the CASS

did authorize the NCIS to search the phone, the warrant was facially invalid because it did

not describe the items to be searched with particularity, as required by *Groh v. Ramirez*,

540 U.S. 551 (2004).  In response, the Government argued that Commander Washburn

verbally authorized the search of Appellee's phone, as he was permitted to do by the

Military Rules, the CASS incorporated the affidavit and Attachment A, and the good faith

exception to the exclusionary rule applied.

The district court held an evidentiary hearing on Appellee's motion.  After hearing

testimony from Special Agent Smith and Commander Washburn, and argument from

counsel, the district court made its ruling.  As a matter of fact, the district court found that:

(1) the CASS did not authorize the search of Appellee's phone, J.A. 215–16 ("The written

---

[3] The allegations involving Minor Victim 2 and Minor Victim 3 are not part of this appeal.

7

CASS said only that Agent Smith could search [Appellee] for his phone . . . it's very possible that Special Agent Smith and Commander Washburn thought they were talking about searching the phone, but certainly the written CASS did not authorize that."); (2) the CASS did not incorporate the affidavit and its attachment, *id.* at 215 ("I find that the written CASS did not incorporate the affidavit, so the affidavit is not part of the CASS."); (3) the Government had not proved by a preponderance of the evidence that Commander Washburn had verbally authorized the search of Appellee's phone, *id.* at 216 ("I'm not convinced by a preponderance that [Commander Washburn] said [Special Agent Smith] could search the phone."); and (4) there was no limitation in the CASS on searching the phone, *id.* ("[T]here is also no limitation on the scope of the written CASS as far as searching the phone."). Upon these findings of fact, the district court granted Appellee's motion to suppress. With respect to the Government's good faith argument, the district court reasoned: "if the warrant doesn't say what you can search for, you can't have [] good [faith]." *Id.* at 215.

The Government timely noted its appeal.

## II.

In evaluating the applicability of the good faith exception, we review the district court's legal conclusions de novo and its factual findings for clear error, assessing the evidence in the light most favorable to the prevailing party. *See United States v. Lyles*, 910 F.3d 787, 796 (4th Cir. 2018); s*ee also United States v. Taylor*, 487 U.S. 326, 337 (1988) (explaining that a district court's findings of fact "are, of course, entitled to substantial deference and will be reversed only for clear error").

III.

The Government adopts a peculiar position on appeal. It does not contest the district court's factual findings. Instead, it "concedes that NCIS did not have verbal authorization to search [Appellee]'s phone, that the October 6, 2022[] CASS did not on its face authorize NCIS to search [Appellee]'s phone, and that the CASS did not properly incorporate Agent Smith's affidavit." Appellant Opening Br. at 27. Nonetheless, the Government argues, the good faith exception announced in *United States v. Leon*, 468 U.S. 897 (1984), justified the NCIS's search of Appellee's cell phone.

The Fourth Amendment exclusionary rule provides that evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure.[4] *United States v. Calandra*, 414 U.S. 338, 347 (1974). In *Riley v. California*, the Supreme Court held that "officers must generally secure a warrant before conducting [] a search [of data on cell phones,]" thereby extending the Fourth Amendment's protection against unreasonable search and seizure to cell phone devices. 573 U.S. 373, 386 (2014).

In *United States v. Leon*, "the Supreme Court recognized a good faith exception to [the Fourth Amendment exclusionary rule], under which evidence obtained by an officer who acts in objectively reasonable reliance on a search warrant will not be suppressed,

---

[4] Both parties agree that the Fourth Amendment governs, even though this was a military search. Appellee Br. at 11 n.4. *See also United States v. Seerden*, 916 F.3d 360, 365 (4th Cir. 2019), *as amended* (Feb. 21, 2019) (holding "that the Fourth Amendment governs whether evidence is admissible in federal criminal proceedings" even in cases involving military warrants).

9

even if the warrant is later deemed invalid." *United States v. Thomas*, 908 F.3d 68, 72 (4th Cir. 2018) (citing *Leon*, 468 U.S. at 922). The good faith exception to the exclusionary rule thus allows courts to admit evidence obtained in violation of the Constitution but in reasonable reliance on a defective warrant. *Seerden*, 916 F.3d at 366. *Leon* instructs that the "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of 'all of the circumstances.'" *United States v. McKenzie-Gude*, 671 F.3d 452, 459 (4th Cir. 2011) (emphases omitted) (quoting *Leon*, 468 U.S. at 922 n.23).

The Supreme Court has identified only five limitations to the application of the good faith exception: (1) where a magistrate issues a warrant based on a deliberately or recklessly false affidavit; (2) where a magistrate lacks neutrality and detachment; (3) where a warrant is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; (4) where a warrant is so facially deficient that a reasonable officer could not believe it was valid; and (5) where police recklessly maintain or knowingly enter false information into a warrant database to enable a future arrest. *See Seerden*, 916 F.3d at 366–67 (collecting cases).

## A.

To access the good faith exception, the Government argues for the first time on appeal that the CASS was deficient for a lack of particularity. The Fourth Amendment requires not only that warrants be based on probable cause, but also that they "particularly describ[e] the place to be searched, and the persons or things to be seized." *United States v. Blakeney*, 949 F.3d 851, 861 (4th Cir. 2020) (quoting U.S. Const. amend. IV). The

10

Framers included this provision in order to end the practice, "abhorred by the colonists," of issuing "general warrants." *United States v. Dargan*, 738 F.3d 643, 647 (4th Cir. 2013) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)). The requirement is designed to prohibit broadly phrased warrants that authorize officers to conduct "exploratory rummaging in a person's belongings." *Id.* (quoting *Andresen v. Maryland*, 427 U.S. 463, 480 (1976)). As the Supreme Court has explained, "the Fourth Amendment's particularity requirement assures the subject of the search that a magistrate has duly authorized the officer to conduct a search of limited scope." *Groh v. Ramirez*, 540 U.S. 551, 565 n.9 (2004).

When it comes to particularity, "we construe search warrants in a commonsense and realistic manner, avoiding a hypertechnical reading of their terms." *United States v. Cobb*, 970 F.3d 319, 327 (4th Cir. 2020), *as amended* (Aug. 17, 2020) (quotation marks omitted). A warrant satisfies the particularity requirement when it describes the items to be seized "in a manner that allows an executing officer to know precisely what he has been authorized to search for and seize." *Id.* at 328–29 (citing *Blakeney*, 949 F.3d at 863).

The CASS at issue in this case suffers no particularity error, plain or otherwise. It simply did not authorize the NCIS to search Appellee's phone. That conclusion, taken from a plain reading of the document, is underscored by the factual record in this appeal, to which the Government has conceded. Namely, that Commander Washburn did not verbally authorize Special Agent Smith to search Appellee's cell phone, the CASS did not incorporate Special Agent's Smith's affidavit, and the CASS contained no limitation on

11

the NCIS's search of Appellee's phone. Indeed, it could not contain any such limitation because, to repeat, the CASS *did not authorize the NCIS to search Appellee's cell phone*.

To read a Fourth Amendment particularity deficiency into the CASS on this record, all in order to access the good faith exception, would be to distort the purpose of the Fourth Amendment's particularity requirement beyond recognition. As the Supreme Court has explained, the historical purpose of the particularity requirement is to prevent "exploratory rummaging" by government officers. But finding a particularity error here would enable that very conduct by the Government. Per the Government's theory, any warrant that does not authorize a search of a particular object or person is thereby deficient for lack of particularity. To accept that premise, and use it as a stepping stone to the *Leon* good faith exception, would facilitate an unfettered and unlimited "exploratory rummaging" at odds with the Fourth Amendment protections set down by our Founders. That, we will not do.

Beyond that, there is an inherent tension between the Government's particularity theory and its reliance upon the good faith exception. Assuming arguendo that the Government has correctly alleged a Fourth Amendment particularity error in the CASS, then it has alleged the gravest one possible: a total omission of the item to be searched. This level of deficiency certainly renders a warrant "so facially deficient . . . that the executing officers [could not] reasonably presume it to be valid." *See Groh*, 540 U.S. at 565.

The CASS was not deficient. Law enforcement was. Accordingly, the good faith exception does not apply.

12

B.

To correctly frame the conduct at issue in this appeal, the NCIS clearly exceeded the scope of a valid warrant. Nonetheless, the Government still argues that the good faith exception applies because, according to the Government, the Supreme Court's decision in *Maryland v. Garrison*, 480 U.S. 79 (1987) establishes that the good faith exception applies even in this context.

As detailed in *Garrison*, Baltimore police officers executed a warrant to search "the person of Lawrence McWebb and 'the premises known as 2036 Park Avenue third floor apartment.'" 480 U.S. at 80. When the police officers applied for the warrant, and when they conducted the search, "they reasonably believed that there was only one apartment on the premises [as] described in the warrant." *Id.* In reality, the "third floor" was divided into two apartments. *Id.* One was occupied by the subject of the warrant, and the other was occupied by a third party, defendant Garrison. *Id.* In executing the search, the officers found contraband in Garrison's apartment, which led to his conviction for a violation of the Maryland Controlled Substances Act. *Id.*

The Supreme Court considered two questions from these facts. First, whether the warrant was valid. And second, "the reasonableness of the manner in which [the warrant] was executed." *Garrison*, 480 U.S. at 84.

Regarding the validity of the warrant, the Court noted that, with the benefit of hindsight, the description of the place to be searched was "broader than appropriate because it was based on the mistaken belief that there was only one apartment on the third floor of the building." *Garrison*, 480 U.S. at 85. But the factual mistake in the warrant, and the

13

consequent "ambiguous scope[,]" did not retroactively invalidate the warrant. *Id.* at 86. Rather, the Court determined that the validity of the warrant "must be assessed on the basis of the information that the officers disclosed, or had a duty to discover and to disclose, to the issuing Magistrate." *Id.* at 85. And so, even though the warrant was "ambiguous in scope" when it was executed, it was valid based on the information that was disclosed to the magistrate, as that information was derived from the reasonable exercise of the officers' duties. *See id.* at 85–86.

Finding that the warrant was valid, the Supreme Court then turned to whether the officers' execution of the warrant was unreasonable. But contrary to the Government's suggestion here, the Court did not apply -- or even cite -- the *Leon* good faith exception to resolve this question.[5] *See Garrison*, 480 U.S. at 86–89. Instead, it found that the "the officers' failure to realize the overbreadth of the warrant was objectively understandable and reasonable." *Id.* at 88. This was so because the "objective facts available to the officers at the time suggested no distinction [between the two third floor apartments]." *Id.* So, whether the warrant authorized a search of the entire third floor, or just the target's apartment, the officers' conduct "was consistent with a reasonable effort to ascertain and identify the place intended to be searched within the meaning of the Fourth Amendment." *Id.*

---

[5] Some courts interpret *Garrison* differently. *See, e.g.*, *United States v. Grisanti*, 943 F.3d 1044, 1051 (7th Cir. 2019) (describing *Garrison* as "applying good-faith exception to officer's reliance on warrant with ambiguous scope"); *accord United States v. Pimentel*, 26 F.4th 86, 91 (1st Cir. 2022). As discussed *infra*, we read the case differently.

We do not read *Garrison* as an extension of the *Leon* good faith exception to the execution of a valid warrant. Rather, *Garrison* establishes the more limited rule that there is no Fourth Amendment violation at all where officers reasonably interpret and reasonably execute a valid but ambiguous warrant. The valid warrant in *Garrison* turned out to be overbroad, but the officers' obtainment and execution of that warrant was reasonable on the facts of that case. The good faith exception did not apply because there was no deficiency in the warrant itself. To read the Supreme Court's analysis as an application of the good faith exception is to ignore its prerequisite determination that the warrant was valid.

The question presented in this appeal is more straightforward than what was before the Court in *Garrison.* Here, the CASS was valid, as discussed *supra.* But, unlike the warrant in *Garrison*, the CASS was unambiguous in its scope: it plainly authorized the NCIS to search Appellee's person for his phone, to seize that phone, and nothing more. Special Agent Smith cannot be said to have acted reasonably in her execution of the CASS on the record in this case. A simple reading of the terms of the CASS would have sufficed to inform Special Agent Smith of the extent of her authority. Likewise, as the Government has conceded, not only did the warrant on its face not authorize a search of Appellee's phone, Special Agent Smith did not obtain verbal authorization to search Appellee's phone and the CASS did not incorporate Special Agent Smith's affidavit. On those facts, flouting the authority of the CASS was unreasonable.

The Government relies on *United States v. McLamb*, 880 F.3d 685 (4th Cir. 2018), and *United States v. Grisanti*, 943 F.3d 1044 (7th Cir. 2019), to attempt to bolster its

15

position.  Both *McLamb* and *Grisanti* dealt with the FBI's investigation of a child sexual abuse material website called "Playpen."  After the FBI seized the website, it embedded a computer script on the website that permitted it to locate users accessing Playpen. *McLamb*, 880 F.3d at 687–88.  A warrant obtained by the FBI authorized the FBI to identify and locate anonymous users on the website, wherever they were located, while concurrently specifying that the property to be searched was in the Eastern District of Virginia.  *Grisanti*, 943 F.3d at 1047–48, 1050 (reviewing challenge from defendant located in Indiana who argued the warrant was invalid for authorizing searches outside of the Eastern District of Virginia).  This prompted multiple Fourth Amendment challenges across the country attacking, inter alia, the warrant's particularity and execution, and the magistrate judge's jurisdiction to issue it.  Each of the eleven circuit courts to consider the issue held that, even if the warrant violated the Constitution, the "good-faith exception applies to [those] agents who relied on [it]."  *See Grisanti*, 943 F.3d at 1049 (collecting cases).

As a threshold matter, the Government's reliance on these cases is inapposite.  As stated in *McLamb*, the assumption of the courts that considered the Playpen warrant was that the good faith exception applied *even if* the warrant was deficient.  *See McLamb*, 880 F.3d at 689–90 ("Even if the [] warrant violates the Fourth Amendment, the *Leon* good faith exception precludes suppression of the evidence.") (collecting cases).  But this does not mean that the opposite is also true: that the good faith exception applies, even though the CASS was valid.

16

More importantly, both *McLamb* and *Grisanti* are distinguishable on their own analyses. In *McLamb*, we presumed the warrant's deficiency and relied on the consensus from our sister circuits that "the *Leon* good faith exception precludes suppression of the evidence." *McLamb*, 880 F.3d at 689. The decision itself only considered the narrow question concerning the applicability of the defendant's proffered exceptions to the good faith rule. The case does not, as the Government suggests, stand for the broader proposition that the good faith exception can apply where the Government exceeds the scope of a valid, unambiguous warrant, as it did here.

In *Grisanti*, the Seventh Circuit recognized, as we have in this case, that "[t]he good-faith exception does not apply to a search that clearly exceeds the scope of a warrant." 943 F.3d at 1051. Instead, the court held that the agents had not unreasonably exceeded the warrant. The court noted that the agents could not have "believed themselves to be cabined in the Eastern District of Virginia but flagrantly disregarded that boundary when the stated purpose of the warrant, as issued, was to uncover the *unknown locations* of anonymous users." *Id.* (emphasis in original). Moreover, the terms of the warrant permitted agents "to obtain information from any computer used to log into [the website]." *Id.* Under those circumstances, the court found that the agents could have reasonably believed that any computer used to log in to the website was within the scope of the warrant.

The other cases the Government relies on are similarly inapposite. To be sure, the First Circuit in *Pimentel* did find that "the *Leon* good-faith exception applies to an allegation that the execution of a search warrant exceeded the warrant's scope." *United States v. Pimentel*, 26 F.4th 86, 90 (1st Cir. 2022). But critically, *Pimentel* actually

17

supports Appellee's position in the instant case. Namely, as relevant to this appeal, the First Circuit also recognized that "clearly exceeding the scope of an unambiguous warrant cannot be saved by the good-faith exception." *Id.* at 91. That is precisely what happened here.

Likewise, the Tenth Circuit has recognized that "the *Leon* good faith exception [] cannot apply when the officer's search 'exceed[ed] the scope of the warrant.'" *United States v. Wagner*, 951 F.3d 1232, 1244 (10th Cir. 2020) (quoting *United States v. Angelos*, 433 F.3d 738, 746 (10th Cir. 2006)). In *Angelos*, an FBI agent submitted an affidavit to an Assistant United States Attorney in support of a warrant to search the subject's residence, and to seize his car, safe box, and any drug paraphernalia, illegal narcotics, illegal proceeds, and photographs or videotapes pertaining to the sale of drugs. 433 F.3d at 743–44. The Government attorney then prepared an application for a search warrant and a proposed search warrant, and submitted them together, with the supporting affidavit of the FBI agent, to a judge for approval. *Id.* at 744. But the proposed warrant was narrower than the affidavit. The proposed warrant requested authorization only to search the trunk of the subject's car and safe box, and to seize specific items therein. *Id.* It did not authorize the executing officers to search the subject's entire residence, as the supporting affidavit had requested. The judge signed the warrant as written. *Id.* The executing officers then exceeded the warrant by searching the subject's entire house and seizing items other than those specifically listed in the warrant. *Id.* at 744–46.

The Tenth Circuit found that the warrant met the Fourth Amendment's particularity requirement, was facially unambiguous, and contained no constitutional or clerical defects.

18

*Angelos*, 433 F.3d at 745.  In short, the warrant was valid and unambiguous.  The court also found that the scope of the warrant was not informed by the original affidavit, because there were no disputed terms within the warrant that needed clarification.  *Id.* at 746 ("[A]s noted, the warrant describes with particularity, and without ambiguity, the items to be seized.").

Therefore, the Tenth Circuit found that the *Leon* good faith exception was "inapplicable."  *Angelos*, 433 F.3d at 746.  In doing so, the court noted, as a general principle, that "the Court in *Leon* made reference to officers 'properly execut[ing] [a] warrant and search[ing] only those places and for those objects that it was reasonable to believe were covered by the warrant.'"  *Id.* at 746 (quoting *Leon*, 468 U.S. at 918, n.19).  From this, the court noted that the *Leon* good faith exception, "will not save an improperly executed warrant."  *Id.*  Rather, as with this appeal, the problem lay "in the execution, and not the constitutionality, of the search warrant."  *Id.*

Turning then to whether the officers reasonably exceeded the scope of the search warrant, the court explained:

> [a]ssuming the agents executing the warrant actually read it, they reasonably should have noticed its limited scope. In turn, the agents could have, upon realizing that the scope of the warrant was narrower than requested by [the agent], contacted the issuing judge by phone in an attempt to receive authorization to expand the scope of the search to include the entire premises

*Angelos*, 433 F.3d at 746.  By failing to take the minimal steps of reading the warrant -- or worse, by disregarding it -- "the officers cannot be said to have acted reasonably."  *Id.*  And

19

because the officers had unreasonably exceeded the scope of the unambiguous warrant, suppression was appropriate. *Id.* The same is true here.

The throughline of these decisions is that the Government cannot fall back on the good faith exception when it unreasonably exceeds the scope of an unambiguous warrant. As we have stated, the CASS was not ambiguous, nor was the NCIS's execution of it reasonable. Accordingly, the good faith exception is not implicated.

## C.

Having held that the CASS was not deficient for a lack of particularity, and that the NCIS unreasonably exceeded the scope of the CASS, we hold, as did the district court, that the good faith exception does not apply to this case.

This conclusion is compelled by the law as applied to the facts we are presented with here. The Government has conceded that Special Agent Smith knew that the CASS did not authorize the NCIS to search Appellee's phone, Commander Washburn had not given her verbal authorization to search the phone, and her affidavit with its attachment was not incorporated by reference into the CASS. In this context, it was not reasonable for her to execute a search in violation of the express terms of the underlying warrant. The error here was simple, but critical: Special Agent Smith did not abide by the plain terms of the CASS, which she herself drafted. A lack of competence in this instance cannot be converted into good faith.

## D.

The dissent mischaracterizes both fact and law in its attempt to shoehorn this case into a posture favorable to the Government. In the dissent's view, this is simply a "clerical

error" suppression case, where we should apply the *Leon* good faith exception. One need not look hard to see the inaccuracy of the dissent's theory.

Since the dissent asserts that we are "dead wrong" about the facts, we shall start there. Post at 39. After the evidentiary hearing on Appellee's motion, the district court found *as a matter of fact* that:

- The CASS **did not authorize** Special Agent Smith to search Appellee's phone;

- Commander Washburn **had not verbally authorized** Special Agent Smith to search Appellee's phone;

- And the CASS **did not incorporate** the affidavit that sought authority to search Appellee's phone.

Indeed, the Government conceded those *findings of fact*: "[the] NCIS did not have verbal authorization to search [Appellee]'s phone, [] the October 6, 2022, CASS did not on its face authorize [the] NCIS to search [Appellee]'s phone, and [] the CASS did not properly incorporate [Special] Agent Smith's affidavit." Appellant Br. at 27. Viewing those facts in the light most favorable to Appellee, as we must in this appeal, it necessarily follows that Special Agent Smith could not have thought that she was authorized to search Appellee's phone. How could she when she had not received either written or verbal authorization to conduct the search? To infer otherwise, as the dissent does, is to ignore the undisputed facts and our obligation to consider them in the light most favorable to Appellee.

Mischaracterizing the undisputed facts is the only way the dissent can reach the precedent it accuses us of ignoring. Post at 34–37. The authorities cited by the dissent are

21

not applicable because the facts here are not as the dissent imagines them to be. Thus, we do not ignore the authorities the dissent cites. Instead, we focus on the relevant case law given the actual facts of this case. Indeed, my dissenting colleague omits the portions of the decisions she cites that render that conclusion obvious.

For example, in *Sheppard*, the Supreme Court relied on the fact that the issuing judge had verbally "informed [the officer] that [the judge] would authorize the search as requested." *Massachusetts v. Sheppard*, 468 U.S. 981, 989 (1984). This was material to the Court's analysis, as it explained, "we refuse to rule that an officer is required to disbelieve a judge who has just advised him, by word and by action, that the warrant he possesses authorizes him to conduct the search he has requested." *Id.* at 989–90. No such thing happened here. To the contrary, in the present case the Government has conceded that Commander Washburn **did not** provide "verbal authorization to search [Appellee]'s phone." Appellant Br. at 27. So, by word and by action, Special Agent Smith was not authorized to search Appellee's phone. By word, from the plain terms of the CASS. And by action, from Commander Washburn.[6]

The same is true for our decision in *Qazah*, another clerical error suppression case. There, the clerical error was that the incorporated affidavit requested authorization to search the wrong person's residence. *United States v. Qazah*, 810 F.3d 879, 887 (4th Cir. 2015) ("The signed warrant . . . included an Attachment B, albeit the incorrect one.").

---

[6] To argue otherwise, the dissent relitigates the testimony presented to the district court in the evidentiary hearing. But, critically, the court did not find that testimony credible, as the Government has conceded on appeal.

22

Critically, however, the warrant itself "correctly identified the place to be searched." *Id.* That is the exact opposite of this case, where the CASS **did not authorize** the search that took place, and the Government has conceded that the CASS **did not incorporate** Special Agent Smith's affidavit. Read together with the Government's concession that Commander Washburn **did not verbally authorize** the NCIS to search Appellee's phone, it is apparent that *Qazah* has no bearing on this appeal.

Indeed, the dissent's characterization of *Qazah* misses the point. As the *Qazah* court noted, there was no dispute between the parties that "the actual search conducted or the items seized were []authorized by the correct version of the warrant." 810 F.3d at 886. The error was merely "a technical one." *Id.* The requesting Assistant United States Attorney had emailed the magistrate judge the warrant with the correct attachment for review but provided the incorrect attachment in person for the magistrate to sign. The magistrate judge, the Assistant United States Attorney, and the attendant law enforcement agent all thought the magistrate was signing a warrant with the correct attachment. This was a simple administrative error that is fundamentally incompatible with the circumstances of the instant appeal. As the court recognized in *Qazah*, the officers in that case "were, at most, guilty of simple negligence in failing to recognize the document-assembly error before executing the warrant." *Id.* at 887. The same cannot be said here. To the contrary, here it is undisputed that the NCIS acted without written or verbal authorization, to execute a search based on an affidavit that was not incorporated into the CASS. And acting without written or verbal authorization is no "technical" error.

23

The Government has conceded away any potential argument it may have had by way of the *Leon* good faith exception. The Government concedes that the NCIS clearly exceeded the scope of the CASS, since it has conceded that the CASS **did not authorize** the NCIS to search Appellee's phone. And the Government concedes that this search was unreasonable, since it has conceded that Special Agent Smith **did not receive verbal authorization** to search Appellee's phone, and that the CASS **did not incorporate the affidavit** that requested that authorization. The *Leon* good faith exception is not a panacea that can save the Government when all remaining facts and law fail. The Government's contentions otherwise are only viable if one contorts both fact and law, as the dissent is willing to do. We decline to follow suit.

IV.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.

24

RUSHING, Circuit Judge, dissenting:

The exclusionary rule is not "a strict-liability regime." *Davis v. United States*, 564 U.S. 229, 240 (2011). To the contrary, "when the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful," suppressing evidence does not serve the rule's deterrent purpose. *Id.* at 238 (quoting *United States v. Leon*, 468 U.S. 897, 909 (1984)). Over time, the Supreme Court has "applied this 'good-faith' exception across a range of cases" beyond "*Leon* itself." *Id.* Whatever the factual context, the question is "'whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances.'" *United States v. Stephens*, 764 F.3d 327, 336 (4th Cir. 2014) (quoting *Herring v. United States*, 555 U.S. 135, 145 (2009)).

The majority today creates an exception to the exception, under which a court need not consider the objectively reasonable basis for an officer's mistaken belief in the legality of a search if the warrant did not actually authorize the search. That contradicts precedent from the Supreme Court and our Court, not to mention decisions from other circuits. *See*, *e.g.*, *Massachusetts v. Sheppard*, 468 U.S. 981 (1984); *United States v. Qazah*, 810 F.3d 879 (4th Cir. 2015). Courts have recognized that a warrant may, by mistake, fail to authorize the search intended and yet an officer who carries out the search as intended can have an objectively reasonable good-faith belief that the search was authorized, making suppression unwarranted.

This is such a case. Special Agent Smith's affidavit sought authorization to search Joshua Ray's cell phone for particularized evidence of child sexual abuse. Commander Washburn intended to grant that authorization, and both he and Agent Smith thought he

25

had done so in the warrant he signed. Agent Smith and others executing the warrant adhered to the parameters of the affidavit when searching the phone. But the warrant did not correctly incorporate the affidavit and, without it, the warrant authorized Agent Smith only to seize the phone, not search it. Under all the circumstances, it was objectively reasonable for Agent Smith to believe that the search of Ray's cell phone was lawful. Suppressing the evidence found on Ray's phone is too "harsh [a] sanction" for Agent Smith's honest mistake. *Davis*, 564 U.S. at 240. I would reverse the district court's order suppressing the evidence.

## I.

## A.

An eleven-year-old boy's father reported to the Naval Criminal Investigative Service (NCIS) that Joshua Ray, an active-duty Navy serviceman and the boy's former babysitter, had sexually abused the child. Based on interviews with the boy and with Ray, Agent Smith consulted her immediate supervisor and Navy trial counsel, both of whom "agreed that there was probable cause that [NCIS] could find potential evidence on [Ray's] phone," including text messages, "visitation schedules," photos of the minor victim, search history, and "adult pornography." J.A. 134.

Agent Smith then contacted Ray's commanding officer, Commander Hunter Washburn, about "obtaining a command authorization for search and [seizure] for Mr.

26

Ray's cellular phone."[1]  J.A. 136.  During their initial phone call, Agent Smith informed Commander Washburn of "the probable cause in the investigation and where the investigation had led [] up until that point."  J.A. 136–137.  According to Commander Washburn, Agent Smith "[e]xplained the situation and the intent [] to issue a CASS to conduct a search" of Ray's "person and a cell phone."  J.A. 193.  Commander Washburn instructed that "the search would not commence until a CASS had been signed by [him]."  J.A. 194.  After the phone call, and while Ray was stationed at sea, Agent Smith prepared a written CASS as instructed by Commander Washburn.  She emailed him a draft copy to review.

Immediately after Ray's ship returned on October 6, 2022, Agent Smith met in person with Commander Washburn to review the written CASS and its supporting documentation.  The "Affidavit for Search Authorization" Agent Smith completed "request[ed] authority to search: IC1 Joshua Lee RAY's person[] and . . . personal cellular device," believing it to contain "[e]vidence pertaining to sexual assault of a child."  J.A. 47.  For the "facts and circumstances" establishing grounds for authorization, Agent Smith wrote "See Attachment (A)," J.A. 47, incorporating the attachment into the affidavit by reference.  As relevant here, Attachment A specified:

> This affidavit is made in support of an application for a [CASS] for S/RAY's person and to forensically examine any cell phone(s) belonging to [him].

---

[1] A commanding officer has authority to issue a Command Authorization for Search and Seizure (CASS), which is "the military equivalent of a search warrant."  J.A. 120.  A CASS may be issued orally or in writing.  Military R. Evid. 315(b).  Given Agent Smith's inability to recall at the suppression hearing "exactly what [Commander Washburn] said," the district court was not convinced he issued oral authorization to search Ray's phone.  J.A. 216.  The Government does not appeal that finding.

> This affidavit is being presented for the purpose of locating and examining the seized device for evidence believed to be resident on the device(s) relating to sexual assault of a child . . . .

J.A. 48. Regarding the nature of the search and information to be seized, Attachment A detailed:

> Your Affiant intends to do a full extraction of the phone. Upon extraction, the Government will only search for and seize information that constitutes fruits, contraband, evidence, or instrumentalities of violations of . . . Article 120b (Sexual Assault of a Child) of the UCMJ. This may include, but is not limited to, call logs (incoming, outgoing, missed); numbers listed in the stored phone book, . . . text messages, SMS messages, picture files . . . , movie files . . . , and any other data stored on the phone . . . that can be indicative of Child Sexual Assault . . . .

J.A. 50. Explaining the particulars of the search, Attachment A further stated:

> Pursuant to the execution of the [CASS], the digital evidence may be analyzed forensically by NCIS Agents, NCIS computer forensic agents and/or technical agents and other law enforcement agents and their forensic entities or designees.

J.A. 50. To ensure access to the contents of Ray's phone, Attachment A clarified:

> This warrant permits law enforcement to compel Joshua Lee RAY to unlock any DEVICES requiring biometric access subject to seizure pursuant to this [CASS]. . . . [L]aw enforcement personnel may not otherwise be able to access the data contained within the DEVICES, making the use of biometric features necessary to the execution of the search authorized by this warrant.

J.A. 50–51. After placing Agent Smith under oath, Commander Washburn signed both the affidavit and the final page of the five-page attachment during their meeting.

Commander Washburn also signed the one-page CASS. It stated that, "[a]ffidavit(s) having been made before me by SA Tiffany Smith," Commander Washburn was "satisfied that there is probable cause to believe" that a "[p]ersonal cellular phone" was "being concealed on the person" of "IC1 Joshua Lee RAY," and that "grounds for application for

28

issuance of a command authorized search exist as stated in the supporting affidavit(s)." J.A. 46. Commander Washburn believed the CASS authorized Agent Smith "[t]o search IC1 Ray and his phone." J.A. 205. The preprinted text of the CASS specifically authorizing the search, however, stated that Agent Smith and NCIS were authorized "to search the person and/or place named"—i.e., Ray—"for the property specified"—i.e., "[p]ersonal cellular telephone"—and "if the property is found there to seize it, leaving a copy of this authorization and receipt for the property taken." J.A. 46 (capitalization omitted).

Shortly after Commander Washburn signed the CASS, Agent Smith located Ray, searched his person, and seized his cell phone. Agent Smith gave the phone to NCIS forensic examiners and requested a data extraction in line with the affidavit. NCIS forensic examiners identified images and videos containing child pornography that did not involve Ray's immediate accuser, as well as evidence that Ray had used a file shredding program after his interview with Agent Smith. Believing they needed separate authorization to search for child pornography unrelated to the original victim, the NCIS forensic examiners paused the examination and contacted Agent Smith.

Agent Smith then completed a second "Affidavit for Search Authorization," requesting "authority to search: IC1 Joshua Lee RAY's personal cellular telephone" for "[e]vidence pertaining to possession of child pornography." J.A. 82. The affidavit again incorporated by reference an "Attachment A" explaining that NCIS would perform "a full extraction on the phone," this time looking for evidence of "violations of Article 134 (Possession of Child Pornography) of the UCMJ." J.A. 85.

29

On October 16, 2022, Commander Washburn signed the second CASS—which was identical to the first except for the revised date—and also signed the new affidavit and attachment. After Commander Washburn signed the second CASS, Agent Smith directed NCIS to examine Ray's phone further. Their search yielded additional images and videos containing child pornography.

A grand jury indicted Ray for aggravated sexual abuse of three children, in violation of 18 U.S.C. 2241(c); possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(A); and destruction of records, in violation of 18 U.S.C. § 1519.[2]

### B.

Ray moved to suppress all evidence obtained from the search of his cell phone. Agent Smith and Commander Washburn both testified at the suppression hearing.

In addition to the facts described above, Agent Smith testified that the CASS is a standard Navy form. Based on her experience at NCIS, she considered the CASS, affidavit, and attachment together to constitute the search authorization. *See*, *e.g.*, J.A. 142 ("We consider this the entire CASS. . . . So anytime that we have to file any type of reports, or we reference everything, everything here is in the CASS, all three incorporating documents."). She further testified that she understood the documents to request

---

[2] After this appeal, the district court dismissed the aggravated sexual abuse counts on the Government's motion. The grand jury has returned a superseding indictment charging Ray with two additional counts—for receipt and possession of child pornography—based on evidence recovered from a second phone. Ray has moved to suppress the evidence recovered from the second phone, arguing the search warrant for that phone depended on evidence illegally obtained through the search of the phone at issue here. The district court has stayed those proceedings pending this appeal.

authorization "[t]o not only seize IC1 Ray's phone but also search it." J.A. 145. Agent Smith also confirmed that after Commander Washburn signed all three documents—the CASS, affidavit, and attachment—he made no indication that she would need to return for another warrant to search the phone.

Commander Washburn similarly testified that he met with Agent Smith on October 6, 2022, "to walk through the process of signing the CASS and what that was going to authorize in this case." J.A. 195. He confirmed the accuracy of his signed written statement (submitted with the Government's opposition to the suppression motion) explaining that, in the first CASS, he "granted NCIS written authority to seize and subsequently search the personal cell phone of IC1 Ray." J.A. 80. Consistent with the written statement, he testified that, "in that first CASS," he believed he was giving Agent Smith authority "[t]o search IC1 Ray and his phone." J.A. 205. And when Agent Smith returned for a second CASS, Commander Washburn was not surprised to learn that NCIS had already searched Ray's phone "[b]ecause [he] authorized the search to include the phone." J.A. 196.

The district court granted Ray's motion to suppress the evidence obtained from his phone. The court found that "the written CASS did not incorporate the affidavit" or its limits on the scope of the search because it didn't "sa[y] we incorporate that." J.A. 215. Accordingly, the "written CASS said only that Agent Smith could search Ray for his

phone."[3] J.A. 215–216. Although the court considered it "very possible that Special Agent Smith and Commander Washburn thought they were talking about searching the phone," it rejected the Government's good faith argument, reasoning only that "if the warrant doesn't say what you can search for, you can't have" good faith. J.A. 215–216.

## II.

The Fourth Amendment "contains no provision expressly precluding the use of evidence obtained in violation of its commands." *Leon*, 468 U.S. at 906. Supreme Court decisions, however, "establish an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial." *Herring*, 555 U.S. at 139. The exclusionary rule "operates as 'a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.'" *Leon*, 468 U.S. at 906 (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)).

Over forty years ago, the Supreme Court recognized a "good-faith exception" to the exclusionary rule because, "where the officer's conduct is objectively reasonable, excluding the evidence will not further the ends of the exclusionary rule in any appreciable way." *Leon*, 468 U.S. at 919–920 (internal quotation marks omitted). In *Leon*, the Court held "that the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot

---

[3] As previously mentioned, the district court also concluded that Commander Washburn did not issue an oral CASS under Military Rule of Evidence 315, calling Agent Smith's testimony on this point "very candid," which the court "appreciated." J.A. 216.

32

justify the substantial costs of exclusion." *Id.* at 922. In subsequent decisions, the Court extended the good-faith exception to searches conducted in reasonable reliance on subsequently invalidated statutes, *Illinois v. Krull*, 480 U.S. 340, 349–350 (1987), on erroneous information concerning an arrest warrant (whether the police or a judicial employee caused the error), *Arizona v. Evans*, 514 U.S. 1, 14–16 (1995); *Herring*, 555 U.S. at 146–148, and on subsequently invalidated judicial precedent, *Davis*, 564 U.S. at 240–241. Whatever the context, the "'good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal' in light of '*all of the circumstances*.'" *United States v. McKenzie-Gude*, 671 F.3d 452, 459 (4th Cir. 2011) (quoting *Leon*, 468 U.S. at 922 n.23).

Rather than attempt to answer that question, the majority "bypasse[s] the inquiry into good faith altogether." *United States v. Pimentel*, 26 F.4th 86, 91 (1st Cir. 2022); *see id.* (cautioning that defendants cannot "make an end-run around *Leon* simply by alleging a scope violation or another defect in a warrant's execution"). Instead of considering all the circumstances, the majority concludes the good-faith exception is unavailable because the CASS did not authorize the search NCIS conducted. *See*, *e.g.*, Maj. Op. 21 (reasoning that Agent Smith "could not have thought that she was authorized to search [Ray's] phone" because no CASS authorized the search). This tautological framing makes the good-faith exception inapplicable when a search was not properly authorized—in other words, the precise time it becomes relevant. That approach contradicts precedent from the Supreme Court and this Court applying the good-faith exception in exactly this type of situation. I

33

would apply the good-faith exception and, having conducted the requisite analysis, find it satisfied and suppression unwarranted.

## A.

The good-faith exception is available when law enforcement officers conduct a search that they believe the warrant authorized, even if it didn't. In such a case, "the only question is whether there was an objectively reasonable basis for the officers' mistaken belief." *Massachusetts v. Sheppard*, 468 U.S. 981, 988 (1984); *see United States v. Qazah*, 810 F.3d 879, 887 (4th Cir. 2015).

In *Massachusetts v. Sheppard*—decided the same day as *Leon*—the Supreme Court found the good-faith exception satisfied where officers reasonably believed that the warrant authorized the search they conducted even though it did not authorize the officers to search for or seize any of the items they obtained. There, as here, the affidavit that correctly identified the parameters of the search was not properly incorporated into the warrant. *Sheppard*, 468 U.S. at 986. The investigating detective drafted an affidavit requesting authorization to search the residence for:

> [A] fifth bottle of amaretto liquor, 2 nickel bags of marijuana, a woman's jacket that has been described as black-grey (charcoal), possessions of [the victim], similar type wire and rope that match those on the body of [the victim], or in the above [T]hunderbird. Blunt instrument that might have been used on the victim. Men's or women's clothing that may have blood, gasoline, burns on them. Items that may have fingerprints of the victim.

*Id.* at 985. Unable to obtain the correct warrant form, the detective found and completed a version used in another county for controlled substances searches. *Id.* After reading the affidavit, the judge agreed to authorize the search as requested. However, the judge did

34

not "alter the [warrant] form so as to incorporate the affidavit." *Id.* at 986. Nor did he change the substantive portion of the warrant, which authorized only a search for "any controlled substance, article, implement or other paraphernalia used in, for, or in connection with the unlawful possession or use of any controlled substance." *Id.* at 986 n.2. Officers searched the suspect's residence in accordance with the affidavit and discovered evidence connecting him to the murder, which he then moved to suppress. *Id.* at 987.

The Supreme Court applied the *Leon* good-faith exception. The warrant, as issued, did not authorize the search the officers conducted; as the Court observed, "the description in the warrant was completely inaccurate and the warrant did not incorporate the description contained in the affidavit." *Id.* at 988 n.5. Nonetheless, the Supreme Court applied the good-faith exception and concluded "there was an objectively reasonable basis for the officers' mistaken belief" that "the warrant authorized the search that they conducted." *Id.* at 988. Accordingly, the Supreme Court reversed the state court's judgment erroneously suppressing the evidence. *Id.* at 991.

We applied *Sheppard* to a similar factual scenario in *United States v. Qazah*. There, while investigating two individuals, Qazah and Alquza, for selling stolen cigarettes, ATF agents requested warrants to search their homes for various items. 810 F.3d at 882–883. A prosecutor emailed the magistrate judge a copy of the Alquza application and warrant, which incorporated an attachment listing the specific items to be seized. But when the prosecutor and ATF agent met with the magistrate judge to sign the warrant for Alquza's house, they mistakenly included the wrong attachment, which listed items to be seized from

35

Qazah's house. *Id.* at 883. After a search conducted in accordance with the intended attachment, Alquza moved to suppress recovered evidence, arguing that the good-faith exception did not apply. *Id.* at 885. This Court disagreed, holding that "[t]he error in this case was a technical one . . . which did not influence the warrant's issuance nor adversely affect its execution." *Id.* at 886. That was so even though any person reading the signed warrant and affidavit would have noticed it did not authorize the search the agents actually conducted. *See id.* at 884. Ultimately, the good-faith exception applied because "the search team executed the warrant in a manner that was both consistent with the warrant that they thought they had received and consistent with the warrant that the magistrate judge had intended to issue." *Id.* at 887.

The majority's conclusion that the good-faith exception is categorically unavailable when the warrant did not authorize the search officers conducted is impossible to square with these precedents. The majority holds that "the good faith exception is not implicated" where an officer "unreasonably exceeds the scope of an unambiguous warrant." Maj. Op. 20. But the warrants in *Sheppard* and *Qazah* unambiguously limited the proposed searches to certain items and the officers instead searched for, and seized, different items—no doubt exceeding the scope of the warrants.[4] On the majority's reasoning, that should have

---

[4] The majority incorrectly asserts that *Qazah* "is the exact opposite of this case" because the warrant there "'correctly identified the place to be searched.'" Maj. Op. 23 (quoting 810 F.3d at 887). While the warrant identified Alquza's house as the place to be searched, the incorporated affidavit authorized officers to search for and seize items belonging to Qazah, not Alquza. As here, the "'correct version'" of the affidavit that authorized "'the actual search conducted'" was not properly incorporated into the warrant. Maj. Op. 23 (quoting 810 F.3d at 886). Neither the warrant nor the affidavit authorized (Continued)

36

foreclosed application of the good-faith exception altogether. But it did not. In each case, the Court went on to consider all the circumstances, as *Leon* requires. *See* 468 U.S. at 922 n.23. The majority refuses to do so and instead artificially limits its consideration to the terms of the warrant.

Our sister circuits also have applied the good-faith exception in circumstances like these, where officers mistakenly believed a warrant authorized a search not apparent on its face. For example, the Tenth Circuit found the good-faith exception available on facts strikingly similar to ours in a case the majority does not mention. *See United States v. Russian*, 848 F.3d 1239, 1245 (10th Cir. 2017). There, the warrant application requested authorization to search two cell phones and seize specific data, but the warrant itself authorized only a search of the defendant's residence and seizure of the phones; the warrant "failed to authorize the search of cell phones" or "seizure of any cell phone data." *Id.* at 1243; *see id.* at 1245. The Tenth Circuit held that the good-faith exception applied and was satisfied for three reasons: (1) the searching officer "prepared the warrant application and supporting affidavit," which carefully identified the cell phone data to be searched; (2) "in addition to signing the warrant itself, the magistrate judge signed [the] warrant application and affidavit, which contained a particularized description of the [] cell phones and cell phone data"; and (3) the officer "confined his search to the evidence specified in

---

officers to seize the items they did, nor was there any claim of verbal authorization for the search. In other words, the officers in *Qazah* "acted without written or verbal authorization, to execute a search based on an affidavit that was not incorporated into the [warrant]." Maj. Op. 23. Yet for those same reasons, the majority asserts the good-faith exception is categorically inapplicable here.

37

the warrant application and affidavit." *Id.* at 1246–1247. In sum, "given the lack of misconduct by law enforcement and [the officer's] reliance on a warrant he reasonably believed to be valid" authorization to search the phones, the court concluded suppression "would not serve the underlying purpose of the exclusionary rule." *Id.* at 1247.

Similarly, in *Pimentel*, officers applied for and received a warrant to search "88 Fountain St. 2nd floor . . . which is occupied by and/or in possession of" the defendant. 26 F.4th at 88. But after realizing the defendant had moved upstairs, officers searched the third floor and recovered multiple firearms. *Id.* The First Circuit explained that the defendant's claim that officers "exceeded the scope of the search warrant does not itself foreclose the application of the good-faith exception." *Id.* at 90–91. Rather, the inquiry "turns on whether the . . . officers' belief that the search warrant covered the third floor was objectively reasonable under the circumstances." *Id.* at 92. The court concluded it was, and so the evidence should not be suppressed. *Id.* at 96.

Finally, other circuits have found the good-faith exception implicated where a warrant failed to correctly incorporate an affidavit more specifically describing the place to be searched or things to be seized. *See*, *e.g., United States v. Szczerba*, 897 F.3d 929, 939 (8th Cir. 2018) (applying good-faith exception where the officer "acted negligently in drafting the warrant" and "should have used appropriate authorizing language and ensured that the supporting affidavit was incorporated into the warrant"); *United States v. Tracey*, 597 F.3d 140, 152–153 (3d Cir. 2010) (concluding that, although the officer's "efforts were not legally sufficient" to meaningfully incorporate the affidavit into the warrant, "it would be reasonable for an officer in [this] position to believe the affidavit was properly

38

incorporated and, therefore, the warrant was valid"); *United States v. Hamilton*, 591 F.3d 1017, 1029 (8th Cir. 2010) (holding that "it was objectively reasonable for an officer with [the detective's] knowledge and involvement in the warrant application process to rely on the warrant as incorporating the list of items to be seized from the affidavit, even if we were now to conclude that the words of incorporation were less than clear"). In such cases, the key question remains whether an officer reasonably believed the warrant authorized the search. Holding otherwise short-circuits *Leon*'s reasonableness inquiry.

### B.

Having established that the good-faith exception is available in these circumstances, the question "is whether there was an objectively reasonable basis for [Agent Smith's] mistaken belief" that the CASS authorized the search of Ray's phone. *Sheppard*, 468 U.S. at 988. As an initial matter, the majority is dead wrong when it asserts, without citation, that "[t]he Government has conceded that Special Agent Smith *knew* that the CASS did not authorize the NCIS to search [Ray's] phone." Maj. Op. 20 (emphasis added). The Government has *not* made such a concession. That's the entire point of this appeal. The Government maintains—consistent with her testimony—that Agent Smith "believed that the October 6, 2022, CASS authorized NCIS to search Ray's phone." Opening Br. 44. The question before us, therefore, is whether there was an objectively reasonable basis for her belief. The answer is yes.

First, Agent Smith's affidavit and attachment said that she was seeking permission to search Ray's cell phone. The one-page affidavit presented to Commander Washburn "request[ed] authority to search: IC1 Joshua Lee RAY's person[] and . . . personal cellular

39

device," believing it to contain "[e]vidence pertaining to sexual assault of a child." J.A. 47. Attachment A, which the majority agrees was properly incorporated into the affidavit, *see* Maj. Op. 5, set forth the basis for probable cause and detailed the specifics of the intended search. The attachment notified Commander Washburn that NCIS "intends to do a full extraction of the phone," which would include reviewing Ray's "call logs (incoming, outgoing, missed); numbers listed in the stored phone book, . . . text messages, SMS messages, picture files (jpeg, gif, bmp, dib, jpg, and any other pictures stored on the phone), movie files (mpg, mpeg, aif, mov, ram, and any other movies stored on the phones), and any other data stored on the phone . . . that can be indicative of Child Sexual Assault." J.A. 50. And the attachment specified "[t]his warrant permits law enforcement to compel Joshua [Ray] to unlock any DEVICES requiring biometric access" so that NCIS can complete the forensic examination. J.A. 50.

Second, the CASS referred to the affidavit twice and stated that grounds for "a command authorized search exist as stated in the supporting affidavit(s)." J.A. 46. The district court determined that this language was insufficient to properly incorporate the affidavit into the CASS, a finding no one disputes on appeal. It nevertheless would have been reasonable for Agent Smith to believe this language sufficed, especially when no Navy policy dictated otherwise. *See United States v. Hurwitz*, 459 F.3d 463, 471 (4th Cir. 2006) (explaining that "words of incorporation used in the warrant" need not be "overly precise"). Indeed, Agent Smith testified that, based on her experience at NCIS, she considered the CASS, affidavit, and attachment together to constitute the search authorization.

40

Third, Commander Washburn signed not only the CASS but also the affidavit and the attachment, both of which mentioned searching Ray's phone. Commander Washburn's signatures assured Agent Smith that he was authorizing the search she requested in those documents. *See*, *e.g.*, *United States v. Allen*, 625 F.3d 830, 839 (5th Cir. 2010) (reasoning that "the executing officer who prepared the warrant, the affidavit and the attachment . . . had additional objective reason to believe the warrant was valid" because the magistrate judge "signed not only the warrant, but also the affidavit, to which the list of items to be seized was attached"); *Tracey*, 597 F.3d at 153 (finding good faith where the magistrate signed the affidavit, which was not properly incorporated into the warrant).

Fourth, Agent Smith's multiple conversations with Commander Washburn made clear that she was requesting authorization to search the contents of Ray's phone. *See*, *e.g.*, J.A. 200 (Commander Washburn confirming that "[Agent Smith] told [him] she wanted to seek search authority for IC1 Ray's phone"). After all, the entire basis for seeking a CASS was that Agent Smith had probable cause to believe Ray's cell phone contained evidence of the sexual abuse of a minor, including images and videos. Based on that probable cause, it would have been irrational for Agent Smith to request, or for Commander Washburn to issue, a CASS that authorized seizure of Ray's cell phone but not a search for evidence.

Fifth, Commander Washburn—acting in the role of a neutral, detached magistrate—intended to, and believed that he did, "authorize[] the search to include the phone." J.A. 196; *see also* J.A. 80 ("I then granted NCIS written authority to seize and subsequently search the personal phone of IC1 Ray."). Unlike in other cases, here we are not left to speculate about whether "the Magistrate actually found probable cause to search for, and

41

to seize, every item mentioned in the affidavit." *Groh v. Ramirez*, 540 U.S. 551, 560 (2004). He took the stand and testified that he did. The fact that Agent Smith and Commander Washburn were of one mind in understanding the CASS to authorize the search of Ray's phone surely supports the objective reasonableness of that belief. It also gives us confidence that the search was in fact authorized and supported by probable cause, making the incorporation error here a merely technical one.

Finally, Agent Smith and the NCIS examiner adhered to the scope of the affidavit and its attachment in searching Ray's phone, even pausing the search to request an additional CASS when evidence of a new crime surfaced. Although the CASS failed to properly incorporate the affidavit, Agent Smith was careful to "seiz[e] only those items included in the list of items in the affidavit" that Commander Washburn signed. *Hamilton*, 591 F.3d at 1029. As a result, Agent Smith "executed the warrant in a manner that was both consistent with the warrant that [she] thought [she] had received and consistent with the warrant that [Commander Washburn] had intended to issue." *Qazah*, 810 F.3d at 887.

The majority levels vehement accusations—without any citations—of "[m]ischaracterizing," "contort[ing]," "imagin[ing]," and "relitigat[ing]" the facts to "shoehorn" this case into the good-faith exception. Maj. Op. 21, 22 & n.6, 24. But none of the evidence recounted above contradicts the district court's findings. And in view of the foregoing, Agent Smith reasonably believed that the CASS authorized NCIS to search Ray's phone. Agent Smith asked Commander Washburn for authorization to search Ray's phone, Washburn intended to authorize the search Smith requested, and Washburn and Smith both thought he had done so in the CASS, affidavit, and attachment. NCIS's

42

subsequent search adhered to the parameters described in the attachment. Under these circumstances, Smith's mistaken belief was objectively reasonable, and suppression is not warranted.

III.

Perhaps most importantly, this case is missing "a 'necessary condition for exclusion'"—"[r]eal deterrent value." *Davis*, 564 U.S. at 237 (quoting *Hudson v. Michigan*, 547 U.S. 586, 596 (2006)). The deterrence rationale that drives the exclusionary rule is totally absent from the majority opinion; it proceeds as though suppression is automatic upon finding a Fourth Amendment violation and a "lack of competence." Maj. Op. 20. That is not the law. The exclusionary rule's "sole purpose . . . is to deter future Fourth Amendment violations," thus "[f]or exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." *Davis*, 564 U.S. at 236–237. That is not the case here.

The Supreme Court has instructed that the exclusionary rule should be used only to "deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Herring*, 555 U.S. at 144. "[I]solated negligence" is not enough. *Id.* at 137. The error here does not satisfy that standard, and the majority doesn't claim otherwise. Agent Smith was, at the most, merely negligent in failing to confirm that the signed CASS properly incorporated the affidavit and attachment, which accurately and completely detailed the search to be conducted on Ray's phone. Agent Smith was not "dishonest or reckless in preparing [her] affidavit," and she undoubtedly "harbored an objectively reasonable belief in the existence of probable cause." *Leon*, 468

43

U.S. at 926. In fact, no one disputes that Agent Smith had probable cause to search Ray's phone for evidence—even the district court agreed "that probable cause [was not] an issue." J.A. 206. Because Agent Smith's conduct was not "objectively culpable," any deterrent value here is de minimis. *Herring*, 555 U.S. at 146; *cf. Leon*, 468 U.S. at 918 (rejecting argument that "[s]uppressing evidence obtained pursuant to a technically defective warrant supported by probable cause" would "encourage officers to scrutinize more closely the form of the warrant").

The costs, on the other hand, are weighty. "Exclusion exacts a heavy toll on both the judicial system and society at large," because it "almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence," and "its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment." *Davis*, 564 U.S. at 237. The evidence here—68 images and 10 videos of child pornography and file shredding on Ray's phone—*is* the crime, and suppression is fatal to the criminal prosecution.[5] Agent Smith's negligence in completing the CASS cannot justify that cost. Because the district court erred in imposing "the extreme sanction of exclusion," I would reverse. *Leon*, 468 U.S. at 926.

---

[5] This is not to mention additional evidence of child pornography recovered from a second phone, which Ray has also moved to suppress as fruit of the poisonous tree.